[Cite as *State v. Snyder*, 2011-Ohio-3334.]

COURT OF APPEALS
TUSCARAWAS COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | | |
|---|---|---|
| | : | JUDGES: |
| STATE OF OHIO | : | William B. Hoffman, P.J. |
| | : | Julie A. Edwards, J. |
| Plaintiff-Appellee | : | Patricia A. Delaney, J. |
| | : | |
| -vs- | : | Case No. 10AP060021 |
| | : | |
| | : | |
| EUGENE SNYDER, JR. | : | O P I N I O N |
| Defendant-Appellant | | |

CHARACTER OF PROCEEDING:      Criminal Appeal from Tuscarawas
County Court of Common Pleas Case
No. 2009CR110298

JUDGMENT:      Affirmed

DATE OF JUDGMENT ENTRY:      June 30, 2011

APPEARANCES:

For Plaintiff-Appellee          For Defendant-Appellant

RYAN D. STYER          RODNEY BACA
Prosecuting Attorney          Schnars, Baca & Infantino, LLC
Tuscarawas County, Ohio          610 Market Avenue North
         Canton, Ohio  44702

*Edwards, J.*

{¶1} Appellant Eugene Snyder appeals a judgment of the Tuscarawas County Common Pleas Court convicting him of aggravated murder (R.C. 2903.01(A)) with a firearm specification (R.C. 2941.145), felonious assault (R.C. 2903.11(A)(2)) and five counts of tampering with evidence (R.C. 2921.12). Appellee is the State of Ohio.

<u>STATEMENT OF FACTS AND CASE</u>

{¶2} Shortly after 10:00 a.m. on October 29, 2009, appellant called 911 and reported that he found his wife, Debby Snyder, dead in the driveway of their Mineral City residence. Sheriff's deputies arrived on the scene to find Debby's dead body lying in a pool of blood at the bottom of the front porch steps of the residence, near the driver's side of a Chevy Trailblazer. The front of Debby's neck had three incisions, measuring up to nine inches in length and up to four inches in depth. Roughly one-half of her neck was transected, including her larynx and part of her esophagus. The crime scene revealed a trail of blood leading from the bottom of the driveway to the area where the body was found. Blood was also found on the interior of the Trailblazer, the exterior of the driver's side door, and the rear wheel on the driver's side.

{¶3} At the scene, appellant explained to police that Debby had not been home for days and when he left the house at 5:00 a.m. for work that morning, he noticed her Trailblazer in the driveway. After checking the passenger side window with a flashlight and not seeing her purse in the vehicle, he assumed she left with someone else and he went to work. Appellant was self-employed with a trash route. He claimed that when he arrived home around 10:00 a.m. after finishing his route and stopping at the landfill, he noticed Debby's body lying in the driveway. When questioned about the fact that he

claimed to have just returned from work, but he was wearing slippers, he explained that he stopped to change out of his boots upon entering the home to call 911.

{¶4} Sheriff Walt Wilson drove appellant to the home of Gary Snyder, appellant's son, to wait while the crime scene was processed. While in route appellant confessed that he had removed his wife's wedding ring from her finger and hid it in the basement bathroom above the shower. He later explained that he took the ring off her finger because "it was sticking up there like a rose in a shit pile." Tr. 545. Officers recovered the ring above the basement shower.

{¶5} Late in the afternoon of October 29, deputies searched the area of the Kimble landfill where appellant had dumped a load of trash earlier that day. Officers located a shirt with an image of a trash truck and the words "Snyder Enterprises." The shirt was covered in dark stains which were determined to be bloodstains.

{¶6} Appellant agreed to come to the Sheriff's office for an interview on October 30, 2009. He was interviewed by Detective Orvis Campbell. Appellant initially repeated his story that he found the body when he returned home from work. He also explained that in the afternoon of October 28, Debby's daughter called him, looking for her mother. He told his stepdaughter that Debby was "probably out with her damn boyfriend somewhere" and hung up the phone. He also explained that he spoke with Debby around 8:00 p.m. on October 28, and she told him she would be home around 10:00 p.m. to sign checks for their business, which was in Debby's name.

{¶7} When appellant was confronted with the bloody shirt found in the landfill, appellant changed his story and explained that he found his wife dead before he left for

work. When further confronted, appellant began to admit that he was responsible for her death.

{¶8} Appellant said that his wife came home around 10:00 p.m. and they began arguing about money. Debby told him she had had an affair, but it was a mistake. Appellant and Debby began physically fighting and hitting each other. He admitted that she got into the Trailblazer, and while she was sitting there he went to the garage and retrieved a utility knife, which he used to cut her neck.

{¶9} After a break in the interview, appellant revealed that he shot Debby as well. He explained that he had a .32 caliber pistol in his pocket when she returned home. He stated that Debby came after him with a shovel and he unloaded the pistol at her, but she kept coming after him. He said she told him, "You old fucker, I'm gonna kill you." When she continued to pursue him despite the shooting, he went into the garage and got the utility knife. She was sitting in her SUV and weakening. He said at that point she was "still running her fuckin' mouth" so he cut her twice. Following the interview, appellant led detectives to retrieve his bloody clothes which he had discarded along his trash route, and to the place at Atwood Dam where he had thrown the gun and knife into the water.

{¶10} Officers noted that the shovel on appellant's property was covered with leaves and standing upright against a dirt pile, and did not appear to have been recently moved or used in an assault. Although appellant claimed he suffered a painful injury to his ribs from the blow from the shovel, he complained to a medic on the scene about chest pain but never mentioned this rib injury. He never complained to jail staff about this injury and had no apparent marks.

{¶11} The autopsy demonstrated that in addition to the incised wounds to her neck, Debby had 12-15 contusions under her scalp, suggesting blunt force trauma to her head. She had severe bruising on both knees and elbows. The autopsy also revealed four gunshot wounds, two to her torso and two to her head. Debby had cocaine present in her bloodstream. The coroner found that although they were not "drop and die" injuries, the gunshot wounds would have eventually killed Debby. However, the incised wounds to the neck by themselves would have caused her death.

{¶12} Appellant was indicted by the Tuscarawas County grand jury with aggravated murder with a firearm specification, murder with a firearm specification, felonious assault and five counts of tampering with evidence. The case proceeded to jury trial.

{¶13} At trial, appellant testified that he and Debby had a strained relationship for years, and he started planning to divorce her in March, 2009. She had stopped dusting the house and began "laying out at bars." He said she was like a "blood hound" and could sniff out money anywhere he tried to hide it from her. He knew of her drug use and believed she had been unfaithful to him from day one. They fought often about money as Debby's drug habit was expensive.

{¶14} Appellant claimed he was burning brush in the evening hours of October 28, 2009, and carried a pistol with him to shoot small animals that might scurry out of the burning brush while on fire, lest they run into his neighbor's barn while still on fire and burn it down. He testified that when Debby returned home that night, she confronted him about $1,500.00-$1,800.00 she claimed he had taken from the business. She began demanding that he give her the money. He claimed that they

began punching each other. She then hit him in the ribs with a shovel. He testified that he fired two warning shots. He claimed she then told him that "little cap gun" he had wasn't going to stop her and came at him again. As she chased him up the driveway, he unloaded the gun on her. He testified that she was screaming at the top of her lungs about all her boyfriends and threatening to shove his gun up his ass. She called him an "SOB" and a "MF'er." While he was shooting he saw her go to her knees and knew he had hit her, but he reloaded and shot two more times. He testified that she kept getting up and coming after him.

{¶15} Appellant testified that he went into the garage to get the knife. At this point she was sitting in the SUV. He claimed they struggled over the knife, with Debby at one point taking the knife from him and cutting his finger. He claimed he blacked out in the driveway and woke up there at 1:48 a.m., wet and cold.

{¶16} However, appellant later admitted on the witness stand that he remembered cutting her one time and that when he slit her throat he "wanted her to shut up." He said he was "pissed to no end, uncontrollable" when she continued to talk about the other men she had slept with. He stated that if she hadn't hit him with the shovel, they wouldn't be here today because otherwise the argument would have been just like most of their fights, it would have been over and done with.

{¶17} Appellant also presented the expert testimony of Dr. Werner Spitz, a medical pathologist. Dr. Spitz testified that the kind of wounds inflicted on the victim in this case were indicative of a person in a fit of rage and emotionally charged. He testified that Debby might have been aggressive and had superhuman strength even after being shot because of the level of cocaine in her system. He testified that in his

opinion the gunshot wounds did not contribute to her death, and the sole cause of death was the lacerations to her neck.

{¶18} The jury found appellant guilty of aggravated murder with the firearm specification and felonious assault.  Appellant entered guilty pleas to the tampering with evidence charges before the trial concluded.  The court had instructed the jury to not consider the lesser-included offense of murder if they reached a guilty verdict on aggravated murder.   Appellant was sentenced to life imprisonment without the possibility of parole.  He assigns six errors on appeal:

{¶19} "I. THE TRIAL COURT VIOLATED THE APPELLANT'S DUE PROCESS RIGHTS WHEN IT IMPROPERLY INSTRUCTED THE JURY WITH REGARDS TO AGGRAVATED MURDER.

{¶20} "II. THE TRIAL COURT VIOLATED THE APPELLANT'S DUE PROCESS RIGHTS WHEN IT FAILED TO PROVIDE JURY INSTRUCTIONS OF MANSLAUGHTER, INVOLUNTARY MANSLAUGHTER AND SELF-DEFENSE TO THE JURY.

{¶21} "III. THE TRIAL COURT ABUSED ITS DISCRETION AND DENIED THE APPELLANT HIS DUE PROCESS RIGHTS TO A FAIR TRIAL BY FAILING TO GRANT HIS MOTION FOR MISTRIAL.

{¶22} "IV. THE TRIAL COURT ABUSED ITS DISCRETION AND DENIED THE APPELLANT HIS DUE PROCESS RIGHTS TO A FAIR TRIAL BY ALLOWING TESTIMONY IN VIOLATION OF EVIDENCE RULE 401 AND 403.

{¶23} "V. THE TRIAL COURT ABUSED ITS DISCRETION AND DENIED THE APPELLANT HIS DUE PROCESS RIGHTS TO A FAIR TRIAL BY NOT ALLOWING

EVIDENCE OF THE VICTIM'S CHARACTER REGARDING SPECIFIC INSTANCES OF CONDUCT RELATED TO THE VICTIM'S CHARACTER AS IT RELATES TO A CLAIM FOR SELF-DEFENSE OFFERED BY THE APPELLANT.

{¶24} "VI. THE EVIDENCE IS INSUFFICIENT TO SUSTAIN THE CONVICTION AND THE VERDICT IS AGAINST THE MANIFEST WEIGHT OF EVIDENCE."

I

{¶25} Appellant argues that the court erred in the jury instructions concerning the definition of prior calculation and design by creating an "obvious bright line test."

{¶26} Jury instructions must fairly and correctly state the law applicable to the evidence presented at trial. *Wozniak v. Wozniak* (1993), 90 Ohio App.3d 400, 410, 629 N.E.2d 500; see, also, *Kokitka v. Ford Motor Co.* (1995), 73 Ohio St.3d 89, 93, 1995-Ohio-84, 652 N.E.2d 671. If taken in their entirety, the instructions fairly and correctly state the law applicable to the evidence presented at trial, reversible error will not be found merely on the possibility that the jury may have been misled. *Wozniak v. Wozniak,* supra. Rather, this Court must determine whether the jury charge in its entirety resulted in prejudice. *State v. Jackson* (2001), 92 Ohio St.3d 436, 446, 2001-Ohio-1266, 751 N.E.2d 946.

{¶27} The Ohio Supreme Court has stated that it is not possible to formulate a bright-line test to distinguish between the presence or absence of prior calculation and design, but instead each case turns on the particular facts and evidence presented at trial. *State v. Taylor* (1997), 78 Ohio St.3d 15, 20. In *Taylor v. Mitchell* (2003), 296 F. Supp. 2d 784, the habeas corpus action considered by the U.S. Northern District of Ohio Federal Court regarding the conviction reviewed by the Ohio Supreme Court in

*Taylor*, supra, the federal court summarized Ohio law regarding prior calculation and design as follows:

{¶28} "In view of the understandable lack of a bright line rule governing determinations of whether the proof shows prior calculation and design, Ohio courts have consistently considered various factors in addition to those-the defendant's relationship with the victim, the thought given by the defendant to the means and place of the crime, and the timing of the pertinent events-recited in *Taylor,* 78 Ohio St.3d at 19, 676 N.E.2d 82, when determining whether the defendant engaged in prior calculation and design.

{¶29} "Among these other, frequently considered factors are:

{¶30} "- whether the defendant at any time expressed an intent to kill.

{¶31} "- there was a break or interruption in the encounter, giving time for reflection.

{¶32} "- whether the defendant displayed a weapon from the outset.

{¶33} "- whether the defendant retrieved a weapon during the encounter.

{¶34} "- the extent to which the defendant pursued the victim.

{¶35} "- the number of shots fired." Id. at 821-822, internal citations omitted.

{¶36} The trial court instructed the jury as follows:

{¶37} "Ladies and gentlemen, prior calculation and design means that the purpose to cause the death was reached by a definite process of reasoning in advance of the homicide which process of reasoning must have included a mental plan involving studied consideration of the method and means with which to cause the death. To constitute prior calculation there must have been sufficient time and opportunity for the

planning of an act of homicide, and the circumstances surrounding the homicide must show a scheme designed to carry out the calculated decision to cause the death. No definite period of time must elapse and no particular amount of consideration must be given, but acting on the spur of the moment or after momentary consideration of the purpose to cause the death is not sufficient.

{¶38} "You may consider the following factors when determining whether prior calculation and design exist in this case. Whether the victim, Ms. Snyder, and the Defendant, Mr. Snyder, knew each other, and if so, whether their relationship was strained; whether Mr. Snyder chose the murder site or weapon before the murder; whether the killing was a drawn out act or an eruption of events; whether Mr. Snyder at any time expressed an intent to kill Debby Snyder; whether there was a break or interruption in the encounter giving time for reflection; whether Mr. Snyder displayed a weapon from the outset; whether Mr. Snyder retrieved a weapon during the encounter; the extent to which Mr. Snyder pursued Debby Snyder; and then lastly, the number of shots fired."

{¶39} The trial court's instruction correctly stated the law as outlined in *Taylor v. Mitchell*, supra. Contrary to appellant's argument, the court did not create a bright-line test to distinguish between the presence and absence of prior calculation and design. Rather, the court instructed that the jury *may* consider the factors in determining whether appellant acted with prior calculation and design, which is a correct statement of Ohio law.

{¶40} The first assignment of error is overruled.

II

{¶41} In his second assignment of error, appellant argues that the court erred in refusing to instruct the jury on the lesser-included offenses of voluntary manslaughter and involuntary manslaughter, and on the affirmative defense of self-defense.

{¶42} An instruction is not warranted every time any evidence is presented on a lesser-included offense. There must be "sufficient evidence" to "allow a jury to *reasonably* reject the greater offense and find the defendant guilty on a lesser included (or inferior-degree) offense." (Emphasis sic.) *State v. Shane,* 63 Ohio St.3d at 632-633, 590 N.E.2d 272; *State v. Conway,* 108 Ohio St.3d at 240,842 N.E.2d at 1027, 2006-Ohio-791 at ¶ 134. (Emphasis in original).

{¶43} Voluntary manslaughter is defined in R.C. 2903.03(A):

{¶44} "No person, while under the influence of sudden passion or in a sudden fit of rage, either of which is brought on by serious provocation occasioned by the victim that is reasonably sufficient to incite the person into using deadly force, shall knowingly cause the death of another[.]"

{¶45} "Before giving a jury instruction on voluntary manslaughter in a murder case, the trial judge must determine whether evidence of reasonably sufficient provocation occasioned by the victim has been presented to warrant such an instruction." *State v. Shane* (1992), 63 Ohio St.3d 630, 590 N.E.2d 272, at paragraph one of the syllabus. "The trial judge is required to decide this issue as a matter of law, in view of the specific facts of the individual case. The trial judge should evaluate the evidence in the light most favorable to the defendant, without weighing the persuasiveness of the evidence." *Id.* at 637, 590 N.E.2d 272, citing *State v. Wilkins*

(1980), 64 Ohio St.2d 382, 388, 415 N.E.2d 303. "An inquiry into the mitigating circumstances of provocation must be broken down into both objective and subjective components." *Shane,* at 634, 590 N.E.2d 272.

**{¶46}** When determining whether provocation was reasonably sufficient to induce sudden passion or sudden fit of rage, an objective standard must be applied. *Id.* "For provocation to be reasonably sufficient, it must be sufficient to arouse the passions of an ordinary person beyond the power of his or her control." *Id.* at 635, 590 N.E.2d 272. Thus, the court must furnish "the standard of what constitutes adequate provocation, i.e., that provocation which would cause a reasonable person to act out of passion rather than reason." (Citations omitted.) *Id.* at 634, fn. 2, 590 N.E.2d 272. "If insufficient evidence of provocation is presented, so that no reasonable jury would decide that an actor was reasonably provoked by the victim, the trial judge must, as a matter of law, refuse to give a voluntary manslaughter instruction." *Shane,* at 364. The subjective component of the analysis requires an assessment of "whether this actor, in this particular case, actually was under the influence of sudden passion or in a sudden fit of rage." *Id.* "Fear alone is insufficient to demonstrate the kind of emotional state necessary to constitute sudden passion or fit of rage." *State v. Mack* (1998), 82 Ohio St.3d 198, 201, 694 N.E.2d 1328.

**{¶47}** However, any provocation by the victim must be sufficient to arouse the passions of an ordinary person beyond his or her control. *Shane,* 63 Ohio St.3d at 634-35, 590 N.E.2d 272. The provocation must be reasonably sufficient to incite the defendant to use deadly force. *Id.* at 635, 590 N.E.2d 272. Mere words do not constitute sufficient provocation in most situations. *Id.* at 637, 590 N.E.2d 272.

{¶48} In the instant case, both the coroner and the expert pathologist who testified on appellant's behalf agreed that the primary cause of death was the incised wounds to the neck cause by appellant cutting her throat with the utility knife. Appellant's expert testified that the gunshot wounds would not have killed Debby. The coroner testified that she would have at some point died from the gunshot wounds, but the lacerations to her neck were fatal in and of themselves.

{¶49} From the evidence presented at trial, a jury could not reasonably find that appellant acted out of rage or passion caused by provocation sufficient to arouse the passions of an ordinary person beyond his or her control. At the time of the attack with the knife the victim had been shot by appellant and was sitting in her SUV. By his own admission she was in a weakened state. Appellant went into the garage, retrieved a knife and came back to Debby with the knife. He testified at trial and stated in his interview with police that he just wanted to shut her up. Mere words do not constitute sufficient provocation in most situations. In this situation, appellant testified that had she not hit him with the shovel earlier, the argument would have been no different than most of their fights and he wouldn't be in court facing a murder charge. Therefore by his own admission, he was provoked primarily by the shovel and not the words. Appellant may have been able to argue that the gunshots were reasonably provoked by the alleged incident with the shovel, but at the point where he retreats and comes back to her with a knife, a reasonable person would not be incited to use deadly force. Debby had been hit four times by appellant's shots and was sitting in her vehicle. Even if we believe appellant's claim that she continued to taunt him about other men she had slept with, such evidence was not sufficient to incite a reasonable person to the use of

deadly force. The court did not err in refusing appellant's requested instruction on voluntary manslaughter.

{¶50} Involuntary manslaughter is defined by R.C. 2903.04:

{¶51} "(A) No person shall cause the death of another or the unlawful termination of another's pregnancy as a proximate result of the offender's committing or attempting to commit a felony.

{¶52} "(B) No person shall cause the death of another or the unlawful termination of another's pregnancy as a proximate result of the offender's committing or attempting to commit a misdemeanor of any degree, a regulatory offense, or a minor misdemeanor other than a violation of any section contained in Title XLV of the Revised Code that is a minor misdemeanor and other than a violation of an ordinance of a municipal corporation that, regardless of the penalty set by ordinance for the violation, is substantially equivalent to any section contained in Title XLV of the Revised Code that is a minor misdemeanor."

{¶53} The evidence does not support a conviction for involuntary manslaughter and an acquittal for aggravated murder. The evidence demonstrated that the front of Debby's neck had three incisions, measuring up to nine inches in length and up to four inches in depth. Roughly one-half of her neck was transected, including her larynx and part of her esophagus. Both expert witnesses testified that the nature of the killing demonstrated "overkill." The evidence only demonstrates that this was a deliberate act to kill the victim, and not, as appellant argues in his brief, a death that occurred in the course of committing felonious assault. The court did not err in refusing appellant's requested instruction on involuntary manslaughter.

{¶54} To establish the affirmative defense of self-defense, the defendant must establish the following elements by a preponderance of the evidence: (1) that he " * * * was not at fault in creating the situation giving rise to the affray"; (2) that he had " * * * a bona fide belief that he was in imminent danger of death or great bodily harm and that his only means of escape from such danger was in the use of" such force; and (3) that he " * * * must not have violated any duty to retreat or avoid the danger." These elements are cumulative and failure to prove any one of them, by a preponderance of the evidence, fails to demonstrate self-defense. *State v. Williford* (1990), 49 Ohio St .3d 247, 248, citing *State v. Jackson* (1986), 22 Ohio St.3d 281, 284, certiorari denied (1987), 480 U.S. 917.

{¶55} As noted earlier, Debby died as a result of the laceration wounds to her neck. While appellant's testimony that she came at him with a shovel threatening to kill him may have required an instruction as to self-defense regarding the gunshot wounds, she died as a result of the wounds to her neck. At that point in time he could not have a bona fide belief that he was in imminent danger of death or great bodily harm and his only means of escape was the use of deadly force. He knew he had hit her with his gunshots at least once, as he saw her fall to her knees. She was in her vehicle without the shovel when he went back at her with the knife. He clearly had an opportunity to retreat and avoid the danger because he had in fact retreated into the garage to retrieve another weapon. While he testified that at one point she wrestled the knife away from him and he was in danger, he is not entitled to a self-defense instruction based on this evidence because he created the situation giving rise to the affray by coming out to her

SUV armed with a knife. The court did not err in refusing to give appellant's requested self-defense instruction.

**{¶56}** The second assignment of error is overruled.

III

**{¶57}** Appellant next argues that the court erred in overruling his motion for mistrial based on comments the court made in the presence of the jury regarding lesser-included offense instructions.

**{¶58}** The granting of a mistrial rests within the sound discretion of the trial court as it is in the best position to determine whether the situation at hand warrants such action. *State v. Glover* (1988), 35 Ohio St.3d 18, 517 N.E.2d 900; *State v. Jones* (1996) 115 Ohio App.3d 204, 207, 684 N.E.2d 1304, 1306.

**{¶59}** "A mistrial should not be ordered in a criminal case merely because some error or irregularity has intervened * * *." *State v. Reynolds* (1988), 49 Ohio App.3d 27, 33, 550 N.E.2d 490, 497. The granting of a mistrial is necessary only when a fair trial is no longer possible. *State v. Franklin* (1991), 62 Ohio St.3d 118, 127, 580 N.E.2d 1, 9; *State v. Treesh* (2001), 90 Ohio St.3d 460, 480, 739 N.E.2d 749, 771. When reviewed by the appellate court, we should examine the climate and conduct of the entire trial, and reverse the trial court's decision as to whether to grant a mistrial only for a gross abuse of discretion. *State v. Draughn* (1992), 76 Ohio App.3d 664, 671, 602 N.E.2d 790, 793-794, citing *State v. Maurer* (1984), 15 Ohio St.3d 239, 473 N.E.2d 768, certiorari denied (1985), 472 U.S. 1012, 105 S.Ct. 2714, 86 L.Ed.2d 728; *State v. Gardner* (1998), 127 Ohio App.3d 538, 540-541, 713 N.E.2d 473, 475.

{¶60} Appellant stipulated prior to trial that he caused the death of his wife. By doing so, the sole issue became appellant's mental state at the time of the death. Prior to trial, the court explained to the jury that appellant had stipulated that he caused his wife's death and the jury would decide the culpable mental state of appellant at the time of his death. Tr. 43.

{¶61} When the court ruled that the jury would not be instructed on the lesser-included offense of manslaughter, counsel for appellant moved for a mistrial on the basis that the court made comments to the jury that appellant would be "found guilty of something." Tr. 1205. Appellant appears to now argue that the trial court promised him an instruction on manslaughter and the entire trial was based on facts that appellant was under the influence of a sudden passion or fit of rage.

{¶62} Appellant has not cited to any place in the transcript where the judge stated in the presence of the jury that appellant would be "found guilty of something." The trial court clearly stated to appellant and the jury throughout the trial that the court may or may not instruct on voluntary manslaughter. Prior to the stipulation, the court stated in a preliminary hearing that he'd make a decision on the instruction based on the evidence presented at trial. During jury selection the court did state that there is a possibility the jurors would consider the offense of voluntary manslaughter but that was not definitely a consideration for the jury. Tr. 44, 46. In opening statement, counsel for appellant acknowledged that he would ask the judge based on the evidence presented to instruct the jury on manslaughter to "include that passion, that rage." Tr. 271.

{¶63} Contrary to appellant's argument, the comments by the court did not require a mistrial. It was clear to all parties throughout the trial that voluntary

manslaughter may or may not be an option presented to the jury.  Further, in response to counsel's motion for mistrial, the court gave the following curative instruction:

**{¶64}** "I have ruled that I will not instruct you on voluntary manslaughter.  You will not consider the possibility of rendering a verdict on voluntary manslaughter in this case.  As a matter of law I have ruled that the jury should not have that opportunity to make a decision on an offense, an inferior offense, that we call voluntary manslaughter. So, I, in that context of a possible instruction on voluntary manslaughter, indicated I believe when I was talking to Mr. Baca that Mr. Snyder would be found guilty of something.  You may not remember that.  If you do remember it I want you to know now that I'm not going to instruct you on voluntary manslaughter and that comment I made then is not correct.  Mr. Snyder can be found guilty or not guilty of the remaining charges in this indictment, aggravated murder with a firearm specification, murder with a firearm specification, felonious assault with a firearm specification.  So, disregard the comment I made if you heard me say that because it does not apply now.  That only was applicable in the context of an instruction on voluntary manslaughter if I was going to give that." Tr. 1228.

**{¶65}** The court did not abuse its discretion in overruling the motion for a mistrial.  Appellant has not demonstrated that a fair trial was no longer possible.

**{¶66}** The third assignment of error is overruled.

IV

**{¶67}** In his fourth assignment of error, appellant argues that the court erred in admitting the testimony of Brad Bullard that while playing horseshoes at appellant's son's home in the summer of 2009, he heard appellant talking about an issue with

Debby concerning checks Debby wrote on the business account, and appellant stated that he would cut Debby's throat. Tr. 474.

{¶68} The admission or exclusion of relevant evidence rests within the sound discretion of the trial court. *State v. Sage* (1987), 31 Ohio St.3d 173, 51 N.E.2d 343, paragraph 2 of the syllabus. An abuse of discretion implies that the court acted unreasonably, arbitrarily or unconscionably. *Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217, 219, 450 N.E.2d 1140.

{¶69} Appellant argues that the danger of unfair prejudice from this testimony outweighed its probative value and the evidence therefore should have been excluded under Evid. R. 403(A). We disagree. The testimony directly related to the issue of prior calculation and design. Just a few months before appellant killed his wife, he was heard saying that he would cut her throat at a time when he was upset with her concerning money issues surrounding their business. On the day of the murder, he caused her death by cutting her throat when they had been fighting about money issues related to the business. The evidence was clearly probative on the issue of prior calculation and design and while prejudicial, its probative valued was not outweighed by any danger of unfair prejudice.

{¶70} The fourth assignment of error is overruled.

V

{¶71} In his fifth assignment of error, appellant argues the court erred in excluding evidence of specific instances of conduct concerning his wife's aggression toward him. Counsel proffered that appellant would have testified that in late 2004 or 2005, Debby entered appellant's grocery and bait store in a violent fashion, picked up a

soda can and hurled it at appellant, striking him just above his eyebrow.  Tr. 983. Debby then jumped on appellant, knocking him to the ground and beating him.  Id.

{¶72} Evid. R. 404(A)(2) governs the admission of evidence concerning the character of a victim:

{¶73} "(A) Character evidence generally. Evidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion, subject to the following exceptions:

{¶74} "(2) Character of victim. Evidence of a pertinent trait of character of the victim of the crime offered by an accused, or by the prosecution to rebut the same, or evidence of a character trait of peacefulness of the victim offered by the prosecution in a homicide case to rebut evidence that the victim was the first aggressor is admissible; however, in prosecutions for rape, gross sexual imposition, and prostitution, the exceptions provided by statute enacted by the General Assembly are applicable."

{¶75} Evid. R. 405 governs the permissible methods for proving character:

{¶76} "(A) Reputation or opinion. In all cases in which evidence of character or a trait of character of a person is admissible, proof may be made by testimony as to reputation or by testimony in the form of an opinion. On cross-examination, inquiry is allowable into relevant specific instances of conduct.

{¶77} "(B) Specific instances of conduct. In cases in which character or a trait of character of a person is an essential element of a charge, claim, or defense, proof may also be made of specific instances of his conduct."

{¶78} The court permitted appellant to present evidence of Debby's reputation for violence pursuant to Evid. R. 405(A).  However, appellant's reliance on Evid. R.

405(B) is mistaken. While appellant argues this evidence was relevant to show his state of mind and therefore relevant to his claim of self-defense or his claim that he acted in a fit of rage or passion, specific instances of conduct are permitted only when the character trait of a person is an essential element of the claim or defense. Debby's propensity for violence was not an essential element of appellant's claim that he acted out of a fit of passion or rage, and her propensity for violence is not an essential element of the defense of self-defense.

{¶79} The Ohio Supreme Court has held that a defendant asserting self-defense cannot introduce evidence of specific instances of a victim's conduct to prove that the victim was the initial aggressor. *State v. Barnes* (2002), 94 Ohio St.3d 21, syllabus. The 11th District Court of Appeals has applied the reasoning in *Barnes* in the context of a voluntary manslaughter "defense," finding that the trial court did not err in limiting a defendant to reputation or opinion evidence. *State v. Handwork*, Portage App. No. 2002-P-0134, 2004-Ohio-6181, ¶70-73.

{¶80} Further, appellant has not demonstrated prejudice from the exclusion of his testimony concerning this incident. He was permitted to present evidence of her reputation for violence and evidence that he sought a civil protection order against Debby at one point in their marriage. Further, in the DVD of appellant's statement to police which was played for the jury, appellant talks about an incident when Debby hit him in the head with a Coke can in the store and was arrested for domestic violence. Tr. 557.

{¶81} The fifth assignment of error is overruled.

VI

{¶82} In his final assignment of error, appellant argues the evidence was insufficient to support the convictions for aggravated murder and felonious assault, and that the judgments of conviction were against the manifest weight of the evidence.[1]

{¶83} In determining whether a verdict is against the manifest weight of the evidence, the appellate court acts as a thirteenth juror and "in reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses, and determines whether in resolving conflicts in evidence the jury 'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541, 1997-Ohio-52, quoting *State v. Martin* (1983), 20 Ohio App.3d 172, 175, 485 N.E.2d 717.

{¶84} An appellate court's function when reviewing the sufficiency of the evidence is to determine whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus.

{¶85} Aggravated murder is defined:

{¶86} "(A) No person shall purposely, and with prior calculation and design, cause the death of another or the unlawful termination of another's pregnancy."

{¶87} Felonious assault is defined:

{¶88} "(A) No person shall knowingly do either of the following:

---

[1] Appellant also argues that there was insufficient evidence to convict him of murder; however, he was only convicted of aggravated murder and felonious assault.

{¶89} "(2) Cause or attempt to cause physical harm to another or to another's unborn by means of a deadly weapon or dangerous ordnance."

{¶90} There was no dispute that appellant caused physical harm to Debby by means of a deadly weapon, nor was there any dispute that appellant caused her death. He argues that the evidence was insufficient to show that he acted purposely, knowingly, and/or with prior calculation and design because his "extreme emotions" at the time "contradicted" that he acted knowingly, purposely and with prior calculation and design.

{¶91} Purposely and knowingly are defined by R.C. 2901.22:

{¶92} "(A) A person acts purposely when it is his specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is his specific intention to engage in conduct of that nature.

{¶93} "(B) A person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist."

{¶94} The Ohio Supreme Court has stated that courts are to look to three primary factors when determining whether prior calculation and design exists in a particular case: (1) whether the victim and the accused knew each other and, if so, whether their relationship was strained; (2) whether the accused chose the murder site or weapon before the murder, and (3) whether the killing was a drawn-out act or an eruption of events. *State v. Taylor* (1997), 78 Ohio St.3d 15, 19, 676 N.E.2d 82. As

discussed in the first assignment of error, relevant factors include whether the defendant at any time expressed an intent to kill; whether there was a break or interruption in the encounter, giving time for reflection; whether the defendant displayed a weapon from the outset; whether the defendant retrieved a weapon during the encounter; the extent to which the defendant pursued the victim; and the number of shots fired. *Taylor v. Mitchell,* supra.

**{¶95}** In the instant case, appellant admitted to shooting at his wife, emptying and reloading his gun. Appellant admitted that after firing the two warning shots, he was trying to hit her with his shots. She was struck with four bullets. He admitted to going into the garage to retrieve a knife after she had been shot four times, and cutting her throat to get her to shut up. Her neck had three deep incisions severing about half her neck, including her larynx and part of her esophagus. His own expert pathologist testified that the acts were deliberate. The jury's finding that appellant acted knowingly and purposely is not against the manifest weight or sufficiency of the evidence.

**{¶96}** As to the element of prior calculation and design, appellant and Debby had an extremely strained relationship. Several months earlier, appellant was heard saying he would cut Debby's throat when he was upset with her about financial issues; by his own admission they were fighting about money shortly before the murder. Appellant expressed frustration to his step-daughter earlier on the day of the murder because he knew Debby had been with her boyfriend. He knew Debby was coming home that night because she called him around 8:00 p.m. and told him she would be home later. Appellant had a pistol in his pocket when his wife came home. Appellant's rendition of the fight and the blood at the scene indicate that this was a drawn out killing

spanning the length of the driveway, with signs of a struggle. Appellant admitted to a break in the encounter when he went to the garage to get a knife. He then pursued Debby with the knife when, having been shot four times, she was sitting in her SUV. The jury's finding that appellant killed Debby with prior calculation and design is not against the manifest weight or sufficiency of the evidence.

{¶97} The sixth assignment of error is overruled.

{¶98} The judgment of the Tuscarawas County Common Pleas Court is affirmed.

By: Edwards, J.

Hoffman, P.J. and

Delaney, J. concur

_____

_____

_____

                                JUDGES

JAE/r0420

IN THE COURT OF APPEALS FOR TUSCARAWAS COUNTY, OHIO

FIFTH APPELLATE DISTRICT

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | |
| | : | |
| | : | |
| -vs- | : | JUDGMENT ENTRY |
| | : | |
| EUGENE SNYDER, JR. | : | |
| | : | |
| Defendant-Appellant | : | CASE NO. 10AP060021 |

For the reasons stated in our accompanying Memorandum-Opinion on file, the judgment of the Tuscarawas County Court of Common Pleas is affirmed.  Costs assessed to appellant.

_____

_____

_____

JUDGES