[Cite as *State v. Hale*, 2024-Ohio-1587.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Plaintiff- Appellee, | : | |
| | | No. 113078 |
| v. | : | |
| MARLON HALE, SR., | : | |
| Defendant-Appellant. | : | |

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** April 25, 2024

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case Nos. CR-22-676153-A and CR-22-676482-A

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Chauncey Keller, Assistant Prosecuting Attorney, *for appellee.*

Susan J. Moran*, for appellant.*

MICHELLE J. SHEEHAN, J.:

{¶ 1} Defendant-appellant, Marlon Hale, Sr., appeals his convictions for aggravated murder and other offenses involving two victims, his ex-girlfriend and her new boyfriend. He raises seven assignments of error for our review.

1. [The] trial court erred when it denied [Hale's] motion for severance of counts, which allowed the state to introduce improper character evidence of [him] in violation of Evid.R. 401-404, thereby denying him of due process and a right to fair trial under both the United States Constitution and Ohio Constitution.

2. The trial court erred in allowing the admission of other[-]acts evidence under 404(B) in violation of Evid.R. 403, and 404(A), which served to deny [Hale] due process and a right to fair trial as guaranteed in the United States and Ohio Constitution.

3. The state committed error by effectively altering the indictment to include dates which were not indicted by the grand jury, violating his right to due process.

4. The trial court denied [Hale] due process by failing to instruct the jury on the inferior offense of voluntary manslaughter and aggravated assault based on evidence of provocation.

5. The trial court erred in denying appellant's motion for acquittal pursuant to Crim.R. 29 when the state failed to submit sufficient evidence of the crimes charged, denying the appellant due process.

6. The trial court erred in allowing the dissemination of repetitive and cumulative prejudicial autopsy photos which unduly influenced the jury, denying [Hale] the right to a fair trial and due process under the United States and Ohio Constitution.

7. [Hale's] convictions are against the manifest weight of the evidence.

{¶ 2} After thoroughly reviewing the evidence in this case and Hale's arguments, we overrule his assigned errors and affirm the judgment of the trial court.

## I. Procedural History and Facts

{¶ 3} In Cuyahoga C.P. No. CR-22-676153, Hale was indicted on seven counts that allegedly occurred on or about November 8, 2022, including one count of aggravated murder in violation of R.C. 2903.01(A), an unclassified felony; two

counts of murder in violation of R.C. 2903.02(A) and (B), unclassified felonies; two counts of felonious assault in violation of R.C. 2903.11(A)(1) and (A)(2), second-degree felonies; one count of attempted felonious assault in violation of R.C. 2923.02 and 2903.11(A)(1), a third-degree felony; and one count of menacing by stalking in violation of R.C. 2903.211(A)(1), a fourth-degree felony, with a furthermore clause that Hale "made a threat of physical harm to or against the victim [J.W.]." The victim of the aggravated murder, murder, and felonious assault charges was Irving Fincher. The victim of the attempted felonious assault and menacing by stalking counts was J.W. J.W. was Hale's ex-girlfriend, and Fincher was her new boyfriend.

{¶ 4} In Cuyahoga C.P. No. CR-22-676482, Hale was indicted on two counts of failure to comply in violation of R.C. 2921.331(B), third-degree felonies, with furthermore clauses that "the operation of the motor vehicle by the offender" on or about November 9, 2022, "caused a substantial risk of serious physical harm to persons or property."

{¶ 5} In April 2023, the trial court granted the state's motion to join the two indictments for a single trial over Hale's objection. The remaining procedural history that is relevant to this appeal will be placed within the corresponding analysis section of this opinion.

**A. Jury Trial**

{¶ 6} The trial began in June 2023, where the following evidence was presented.

{¶ 7} J.W. and Hale used to date. They met through a dating app on Facebook in July 2021. J.W. lived in Sandusky with her daughter. Throughout their relationship, Hale lived in East Cleveland. J.W. testified that Hale would come to Sandusky to see her. She said their relationship progressed "extremely quickly."

{¶ 8} J.W. explained that during their relationship, Hale used to show up at her home or place of work without her inviting him or knowing that he was coming. J.W. worked in a nursing home and was not allowed to have visitors when she was working. She said that he continued showing up at her work even after she told him that she was not allowed to have visitors and after she asked him to stop.

{¶ 9} J.W. explained that she and Hale had an on-and-off relationship. J.W. recalled that in November 2021, Hale got mad at her and her daughter because one of J.W.'s ex-boyfriend's loaned J.W.'s daughter his car to use for homecoming. Hale threatened her daughter. J.W. stated that Hale told her that he was going to make her "daughter have an accident." J.W. thought that Hale meant "he was going to do something to her [daughter's] car." Hale later apologized, and she forgave him.

{¶ 10} J.W. said that she "cut all ties" with Hale in April 2022 but that she still communicated with him occasionally for the next several months. She said that she blocked his cell phone number and changed her work schedule. However, even after that, he would continue to call her from an unknown number. She would sometimes answer the phone and discover that it was him.

{¶ 11} He would also show up at her work, sometimes at 4:00 or 5:00 a.m. J.W. stated that she would park her car and begin walking into work and Hale would

appear from the dark shadows. She and her coworkers would also see Hale in the parking lot at other times during the day. J.W. testified that she and her coworkers were afraid of Hale. J.W. said that she told Hale all the time to leave her alone.

{¶ 12} The state entered 139 pages of J.W.'s cell phone records into evidence. The records contained text messages between J.W. and Hale beginning from July 14, 2022, to October 29, 2022. Between July 14 and July 25, Hale texted J.W. approximately 378 times; J.W. responded to those texts only 15 times. When she did respond, she mostly told him to leave her alone.

{¶ 13} The state reviewed many of the text messages in court while J.W. explained them. In a lot of the texts from Hale to J.W., he asked her to answer her phone. He asked her to open her door, when would she be home, and what time did she wake up that morning. In one text, Hale states, "We had sex last night and this morning and you're tripping." J.W. did not respond to the text about sex. When the prosecutor asked J.W. if she and Hale had sex at that time, J.W. replied, "Heck no. No." Although J.W. did not respond to the text about sex, Hale texted her 14 more times before she finally responded, "We are over * * * You don't have to worry about what time I'm off. Dragging me in the mud." Hale then texted J.W. 23 more times that same day before she responded, "No * * * I'm just not feeling this anymore * * * u grabbing me, popping up on me * * * My shoes were full of mud!!!!!" J.W. explained that when she got off work that day, Hale was in the parking lot and was trying to talk to her. She said that she "literally had to go into the mud to get away * * * to get to [her] car."

{¶ 14} In one of the text messages, Hale asked J.W. if she had gotten her nails done. J.W. explained that Hale was letting her know that he was watching her when she went to the nail salon. He also texted her photos of her car in the middle of the day, parked in the parking lot where she worked. J.W. stated that Hale was letting her know that he "was at [her] job." Hale sent texts telling J.W. that he was waiting for her. He also texted her about her daughter. J.W. stated that she was very concerned that Hale was going to hurt her or her daughter. She said that on a scale of 1 to 10, she said her "concern" level "was at a 20."

{¶ 15} On July 26, 2022, J.W. got home around midnight. When J.W. got home, Hale was standing in her driveway. When she pulled her car into the garage, Hale followed her into the garage. J.W. said that her daughter arrived at that time too. J.W. told Hale that he needed to leave. Hale kept telling her that he left something at her house because he wanted to go inside. J.W. stated that Hale had not left anything at her house.

{¶ 16} J.W. testified that she did not invite Hale in her house, but he followed her inside. They were yelling at each other, and she told him to leave. J.W. said that Hale ran up to her bedroom, claiming that is where he left something of his. J.W. and Hale ended up in a "physical altercation" in her bedroom. J.W. tried to leave her bedroom, but Hale would not allow her to do so.

{¶ 17} J.W.'s daughter testified that she heard the altercation between her mom and Hale. She saw Hale shove her mom. J.W.'s daughter stated that she sprayed Hale with pepper spray. J.W. and her daughter testified that the pepper

spray did not work and that it seemed to make Hale angrier. J.W.'s daughter said that Hale grabbed the pepper spray out of her hand and sprayed it. J.W. explained that after the pepper spray, Hale was "still cussing, trying to get out, destroying stuff, whatever, knocking stuff down. It was just an all-out brawl." J.W.'s daughter called the police. Hale left J.W.'s home before the police arrived.

{¶ 18} The state also presented two police officers from the Sandusky Police Department to testify about the night of July 27, 2022. By the time the police arrived, Hale was gone but his truck was still parked about a block down the street. One of the officers waited for Hale to return to his truck, which Hale eventually did. When Hale saw the officer, he ran but was soon caught. The officers arrested Hale for assault and battery, but J.W. decided not to press charges. J.W. explained that she agreed to drop the charges because Hale told her that he would lose his commercial driver's license if he was convicted. Plus, J.W. said that Hale promised to leave her alone if she dropped the charges and she was planning to move anyway.

{¶ 19} J.W. began dating Fincher in mid-August 2022. Fincher lived in Cleveland Heights. She said that she and Fincher had a great relationship.

{¶ 20} After the incident at the end of July, J.W. testified that Hale left her alone until he began calling her again in late September 2022. She identified many calls from Hale to her from late September and into October 2022, where she did not know who was calling because Hale blocked his phone number with *67, so she answered the call. But as soon as she realized that it was Hale, she hung up within two to four seconds, which the call logs reflect. She agreed that in a couple of the

calls, she talked to Hale a little longer. She said that she told him to please leave her alone. Hale also began texting J.W. again in mid-to-late October 2022. Again, if and when J.W. responded, she mostly told Hale to leave her alone and stop calling her.

{¶ 21} Around November 5, 2022, J.W. was in her car with Fincher in Cleveland. She received a call from an unknown number. She answered it on her Bluetooth speaker, and it was Hale. Fincher listened to the entire call. J.W. said that Hale swore at her and threatened her. J.W. testified, "He told me that I should make a choice, that * * * if I want to live — he said make a choice. It's either you, your daughter or him." J.W. testified that she had not told Hale that she was dating Fincher but she knew that Hale was referring to Fincher when he said "him."

{¶ 22} J.W. explained that prior to November 5, she had not told Fincher about Hale. But after he heard the phone call, she told him everything. J.W. said that Fincher asked her to text him a photo of Hale.

{¶ 23} J.W. testified that when she dated Hale, he lived in East Cleveland. But in November 2022, Hale was living in Cleveland Heights, one street over from Fincher.

{¶ 24} J.W. testified that she stayed at Fincher's house on November 7, 2022. She got up early the next morning and left to go home. She explained that every time she left Fincher's house, she and Fincher talked on the phone until she got to the highway. After she left that morning, she and Fincher were talking on the phone as they always did when she noticed Hale's truck in her rear-view mirror. She

said that Hale was trying to get her to pull over. At one point, Hale ran his truck into her vehicle, trying to "push [her] off the road." She said that she has a dent in her car from it.

{¶ 25} She testified that she was so scared she could not breathe. She pulled off the road to get some medication from her purse. She said that Hale also stopped his vehicle, and they got into a physical altercation. J.W. stated that Hale "slammed [her] into the door" of her car. She said the entire left side of her body hurt. J.W. stated that Hale was swearing at her, calling her a "b*tch," and he told her that he was going to "f*ck [her] up." J.W. said that Hale warned her that if he found her "up here again, [he] was either going to kill [her] or him."

{¶ 26} The state played a 14-second video of the altercation taken by someone in a car stopped behind Hale's truck. The video shows that J.W. had pulled off the road, but Hale stopped his truck in the road so that he was directly beside J.W.'s car. Hale's truck was blocking the right lane of traffic and other cars from proceeding. When the video starts, Hale and J.W. were already out of their vehicles. The video shows J.W. standing between her open driver's side door and her car. Hale is near her open door. The video shows J.W. hitting Hale with something in her hand that appears to be a towel or cloth of some kind. Hale then pushed J.W.'s driver's side door into her with two hands, causing J.W. to fall backwards and hit her vehicle. J.W.'s head also appeared to jerk back and hit the frame of her car when Hale pushed her. J.W. responded by chasing Hale to the front of his truck, and the recording ends.

{¶ 27} J.W. explained that the whole time she was arguing with Hale, Fincher was still on her Bluetooth speaker. Fincher could hear everything that was happening. Fincher was "screaming," asking her where she was. Fincher told her to go to the B.P. gas station that was nearby and said that he would be there soon.

{¶ 28} J.W. drove to the gas station. The state played another video for the jury that was obtained from a business across the street from the gas station. The video is just under four minutes long. J.W. described what was happening as the video played. J.W. pulled into the gas station parking area. As she got out of her car, Hale pulled next to her car, parallel but in the opposite direction, so that the driver's side door to his truck was near her driver's side door. J.W. said that she was still on the phone with Fincher, telling him what was happening while Fincher was driving to the gas station.

{¶ 29} J.W. said that she and Hale got into an argument, and she pushed Hale away from her. Fincher arrived at the gas station soon after J.W. and Hale had gotten there. J.W. explained that Fincher and Hale got into a verbal argument at first and then a physical one. J.W. said that Hale swung at Fincher first but it is unclear on the video due to the location of the parties. The video shows Hale running from Fincher and Fincher chasing Hale and catching up to him. The two men continued to fight. Hale fell the ground at some point during the fight, and Fincher was standing over Hale, hitting Hale while he was on the ground. J.W. said that Fincher was telling Hale to leave her alone. According to the video, the fight lasted approximately 30 seconds.

{¶ 30} Once Hale and Fincher stopped fighting, all three of them walked back towards their own vehicles. J.W. said that she told Hale, "I can't do this anymore, leave me alone, stop it. I don't want you anymore * * * how did you even know I was up here." J.W. testified that Fincher made sure she got into her car and then he turned around and walked back toward his car. J.W. said that she heard an engine "rile up * * * [l]ike vroom, like someone hit the gas really hard." She did not know what it was at first but later realized that the loud noise was Hale's truck "riling up." J.W. testified that she did not see Hale hit Fincher with his truck. J.W. testified that she heard "something thug" and "[a]ll [she] saw was [Hale] taking off." She said that she looked back and she could not see Fincher anymore. She got out of her car and ran down the street to where Fincher was lying. She said that it happened so fast, she could not find Fincher at first.

{¶ 31} The video shows that as Fincher was walking to his car, with his back to J.W. and Hale, Hale backed up a short distance and turned his wheels towards where Fincher was walking. Hale then began driving his truck toward Fincher, accelerating as he did, and hitting Fincher. Hale also hit Fincher's open driver's side door, slamming it shut as he drove past. Hale drove out of the gas station with Fincher seemingly stuck to the front of Hale's truck. The video shows that Fincher eventually fell from the front of Hale's truck onto the street and Hale dragged him under his truck for a short distance before running over him and driving away.

{¶ 32} Police and emergency personnel arrived. They took Fincher to the hospital.

{¶ 33} J.W. testified that later that day, she received a call from an unknown number; it was Hale. She was with police officers when she received the call. Hale asked J.W. if Fincher had died. She said that she did not respond. She never heard from Hale after that.

{¶ 34} Richard Monroe, a police officer with the city of Middleburg Heights, testified that on the evening of November 9, 2022, he received an alert that a Dodge Ram truck with a homicide warrant attached to it was in the area where he was patrolling. He explained that the city installed a "flock camera system," which scans license plates of vehicles travelling through the city for amber alerts, stolen vehicles, and warrants and sends alerts out to officers.

{¶ 35} Officer Monroe found a truck that matched the description travelling west on Bagley Road. He began following it, confirmed that the license plate was the suspected truck, and attempted to initiate a traffic stop. He activated his lights and sirens, but the driver, later confirmed to be Hale, did not pull over. Officer Monroe explained that his dash cam automatically activates 30 seconds before his lights and sirens come on. He notified his supervisor and pursued the truck. The state played Officer Monroe's dash cam for the jury.

{¶ 36} Officer Monroe followed Hale onto Interstate 71. Officer Monroe said the traffic on the highway was "moderate" and Hale was "reckless" as he attempted to get away from the marked police vehicle. The video shows that Hale's truck hit another vehicle on Interstate 71. Officer Monroe's speed was 80 to 113 m.p.h. while

pursuing the truck. Officer Monroe saw Hale attempt to exit the highway at Snow Road but he lost control and hit a guardrail.

{¶ 37} Officer Monroe said that he ordered Hale out of the vehicle, but he jumped out of the window and started running. Officer Monroe chased him until he caught him near Snow Road.

{¶ 38} The detective assigned to the case testified that J.W. gave the police her cell phone and they confiscated several cell phones from Hale's truck. The state entered J.W.'s call logs into evidence as well as the call logs from the phones found in Hale's truck. The evidence shows that there were 267 calls between Hale's and J.W.'s phone between October 13 and November 6, 2022, with most of the calls being from Hale to J.W. The records also show that Hale began texting J.W. again in October 2022, mostly asking her to call him.

### B. Verdict and Sentence

{¶ 39} In Case No. 676153, the jury found Hale guilty of all charges and the furthermore clause attached to the menacing by stalking count. The trial court merged the first five counts (aggravated murder, murder, and felonious assault counts). The trial court sentenced Hale to 25 years to life in prison for aggravated murder, 24 months for attempted felonious assault, and 16 months for menacing by stalking. The trial court ordered that the three counts be served concurrent to each other but consecutive to the sentence imposed in Case No. 676482.

{¶ 40} In Case No. 676482, the jury found Hale guilty of one of the counts of failure to comply with the furthermore clause. The other count of failure to comply

was nolled. The trial court sentenced Hale to 24 months in prison, to be served consecutive to and prior to Hale's sentence in Case No. 676153.

{¶ 41} It is from these judgments that Hale now appeals.

## II. Joinder, Severance, and Other-Acts Evidence

{¶ 42} In his first assignment of error, Hale argues that the trial court erred when it denied his motion to sever the menacing by stalking charge from the other six charges. He contends that trying all the charges together permitted the state to introduce improper character evidence in violation of Evid.R. 404(B), denying him of a fair trial. In his second assignment of error, he argues that even if the other-acts evidence was admissible under Evid.R. 404(B), it was inadmissible under Evid.R. 403(A) because "its probative value [was] substantially outweighed by the danger of unfair prejudice." We will discuss these arguments together because they are related.

### A. Relevant Procedure

{¶ 43} Approximately three weeks before trial, the state filed a notice of intent to use Evid.R. 404(B) evidence of prior acts, informing the trial court that it intended to introduce evidence at trial showing that Hale had previously threatened J.W., broke into her home, assaulted her, and followed her on previous occasions. According to the state, the other-acts evidence was required to prove the elements of the menacing by stalking charge.

{¶ 44} In his motion to sever, Hale argued that the state was attempting to present other-acts evidence to demonstrate that he was a "bad man" with a "history

of violence," which was prohibited under Evid.R. 404(B) and R.C. 2945.59.  Hale further argued that the two offenses, menacing by stalking and aggravated murder, should never have been joined in the same indictment because they "involved unrelated crimes on different dates that were not based on the same transaction" or "common scheme."

{¶ 45} The trial court denied Hale's motion to sever.  It found that the evidence of the separate crimes in the indictment was "not only simple and direct, which would permit a conscientious jury to consider all counts — and the evidence applicable to each of them — separately, but [that] the prior conduct is also part of the *res gestae* tending to prove the other charges, and prejudice is unlikely."[1] (Emphasis sic.)

{¶ 46} Hale renewed his motion to sever at the close of the state's evidence, which the trial court again denied.

**B.  Joinder and Severance**

{¶ 47} Crim.R. 8(A) states:

Two or more offenses may be charged in the same indictment * * * in a separate count for each offense if the offenses charged * * * are of the same or similar character, or are based on the same act or transaction, or are based on two or more acts or transactions connected together or constituting parts of a common scheme or plan, or are part of a course of criminal conduct.

---

[1] This court has stated that "[i]n the simplest of terms, *res gestae* means the facts which form the environment of a litigated case." (Emphasis sic.)  *State v. Spears*, 58 Ohio App.2d 11, 387 N.E.2d 648 (8th Dist.1978), citing *State v. Brown*, 8th Dist. Cuyahoga No. 25284, 1960 Ohio App. LEXIS 812 (Dec. 21, 1960).

{¶ 48} It is well settled that the law favors joinder. *State v. Waddy*, 63 Ohio St.3d 424, 429, 588 N.E.2d 819 (1992). Joinder is liberally permitted to conserve judicial resources, reduce the chance of incongruous results in successive trials, and diminish inconvenience to the witnesses. *State v. Schaim*, 65 Ohio St.3d 51, 58, 600 N.E.2d 661 (1992).

{¶ 49} "Notwithstanding the policy in favor of joinder," Crim.R. 14 permits a defendant to request severance of the counts in an indictment "on the grounds that he or she is prejudiced by the joinder of multiple offenses." *State v. LaMar*, 95 Ohio St.3d 181, 2002-Ohio-2128, 767 N.E.2d 166, ¶ 49. Crim.R. 14 provides in relevant part that if it appears a defendant is prejudiced by the joinder of offenses, "the court shall order an election or separate trial of counts."

{¶ 50} Defendants who appeal the trial court's denial of their Crim.R. 14 motion "bear[] a heavy burden." *State v. Spaulding*, 151 Ohio St.3d 378, 2016-Ohio-8126, 89 N.E.3d 554, ¶ 63. They must show:

> (1) that [their] rights were prejudiced, (2) that at the time of the motion to sever [they] provided the trial court with sufficient information so that it could weigh the considerations favoring joinder against [their] right to a fair trial, and (3) that given the information provided to the court, it abused its discretion in refusing to separate the charges for trial.

*Id.*, quoting *Schaim* at 59.

{¶ 51} However, the state can overcome a defendant's claim of prejudicial joinder by one of two ways. *State v. Lott*, 51 Ohio St.3d 160, 163, 555 N.E.2d 293 (1990). First, the state can overcome a defendant's claim of prejudicial joinder by

"the 'joinder' test." *Id.* at 163. Under this method, if the state shows that the evidence of each crime is simple and direct, then "an accused is not prejudiced by joinder regardless of the nonadmissibility of evidence of these crimes as 'other acts' under Evid.R. 404(B)." *Id.*, citing *State v. Roberts*, 62 Ohio St.2d 170, 175, 405 N.E.2d 247 (1980).

{¶ 52} The second method is "the 'other acts'" test, i.e., if the state can show that it could have introduced evidence of the other crimes at separate trials under Evid.R. 404(B). *Id.* If so, "any 'prejudice that might result from the jury's hearing the evidence of the other crime in a joint trial would be no different from that possible in separate trials,' and a court need not inquire further." *Schaim*, 65 Ohio St.3d at 59, 600 N.E.2d 661, quoting *Drew v. United States*, 331 F.2d 85, 86 (D.C.Cir. 1964).

{¶ 53} The trial court's decision to deny a motion to sever will not be reversed absent a clear showing of an abuse of discretion. *State v. Winters*, 8th Dist. Cuyahoga No. 102871, 2016-Ohio-5921, ¶ 10, citing *State v. Byrd*, 8th Dist. Cuyahoga No. 71789, 1998 Ohio App. LEXIS 1726 (Apr. 23, 1998). The Ohio Supreme Court has defined "abuse of discretion" as an "unreasonable, arbitrary, or unconscionable use of discretion, or as a view or action that no conscientious judge could honestly have taken." *State v. Kirkland*, 140 Ohio St.3d 73, 2014-Ohio-1966, 15 N.E.3d 818, ¶ 67.

## C. Menacing by Stalking

{¶ 54} Count 7 charged Hale with committing menacing by stalking J.W. on or about November 8, 2022. To convict Hale on this count, the state had to prove that he had "engag[ed] in a pattern of conduct" that "knowingly cause[d]" J.W. to believe that he would cause her physical harm or mental distress. R.C. 2903.211(A)(1). The Supreme Court has explained that "'[o]ther acts evidence can be particularly useful in prosecutions for menacing by stalking because it can assist the jury in understanding that a defendant's otherwise innocent appearing acts, when put into the context of previous contacts he has had with the victim, may be knowing attempts to cause mental distress.'" *Spaulding*, 151 Ohio St.3d 378, 2016-Ohio-8126, 89 N.E.3d 554, at ¶ 114, quoting *State v. Bilder*, 99 Ohio App.3d 653, 658, 651 N.E.2d 502 (9th Dist.1994). Thus, evidence of Hale's past conduct was relevant to establish both a pattern of conduct and that Hale knew this conduct would cause J.W. to believe that he was going to harm her. *See State v. Horsley*, 10th Dist. Franklin No. 05AP-350, 2006-Ohio-1208, ¶ 25-26; *Bilder* at 658.

{¶ 55} We agree with Hale that trying the menacing by stalking charge with the other charges in the indictment would expose the jury to a significant amount of evidence that could prejudice him regarding the other charges. We must therefore determine whether the state overcame Hale's claim of prejudicial joinder by one of the two methods set forth in *Lott*, 51 Ohio St.3d at 163, 555 N.E.2d 293.

**D. *Lott's* Joinder Test**

{¶ 56} Courts have held that evidence is "simple and direct" if (1) the jury is capable of readily separating the proof required for each offense, (2) the evidence is unlikely to confuse jurors, (3) the evidence is straightforward, and (4) there is little danger that the jury would "improperly consider testimony on one offense as corroborative of the other." *State v. Wright*, 4th Dist. Jackson No. 16CA3, 2017-Ohio-8702, ¶ 52, citing *State v. Freeland*, 4th Dist. Ross No. 12CA3352, 2015-Ohio-3410.

{¶ 57} After reviewing the evidence in this case, we conclude that the state satisfied the joinder test. The facts were not complicated. The state did not have to present 20 witnesses to tell a fragmented story of what had occurred. J.W. testified about her relationship with Hale, i.e., how it progressed and how it ended. J.W. and her daughter testified as to what happened in Sandusky in July 2022. And J.W. was the only witness to testify to the events that occurred late October and early November 2022.

{¶ 58} Therefore, the trial court did not abuse its discretion when it denied Hale's motion to sever the menacing by stalking charge from the other offenses because the evidence of each crime was simple and direct. When the state satisfies the joinder test, "an accused is not prejudiced by joinder regardless of the nonadmissibility of evidence of these crimes as 'other acts' under Evid.R. 404(B)." *Lott*, 51 Ohio St.3d at 163, 555 N.E.2d 293. However, in the interest of providing

Hale a full analysis and because Hale also challenged the "other-acts" test, we will address it as well.

### E. *Lott's* Other-Acts Test

{¶ 59} Under *Lott's* other-acts test, the state must show that it could have introduced evidence of the other crimes at separate trials under Evid.R. 404(B) if it had tried them separately.

{¶ 60} Evid.R. 404(B)(1) provides that "[e]vidence of any other crime, wrong or act is not admissible to prove the person's character in order to show that on a particular occasion the person acted in accordance with the character." The evidence may, however, "be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Evid.R. 401(B)(2).

{¶ 61} "The admissibility of other-acts evidence pursuant to Evid.R. 404(B) is a question of law" that we review de novo. *State v. Hartman*, 161 Ohio St.3d 214, 2020-Ohio-4440, 161 N.E.3d 651, ¶ 22, citing Leonard, *The New Wigmore: Evidence of Other Misconduct and Similar Events*, Section 4.10 (2d Ed.2019). However, if the other-acts evidence was offered for a permissible purpose, then trial courts have discretion — after "[w]eighing the probative value of the evidence against its prejudicial effect" — regarding whether to admit the evidence. *Id.* We therefore review this question for abuse of discretion. *Id.*

{¶ 62} In *State v. Williams*, 134 Ohio St.3d 521, 2012-Ohio-5695, 983 N.E.2d 1278, the Ohio Supreme Court set forth a three-step analysis for courts to

determine whether other-acts evidence should be admitted: (1) was the evidence relevant, (2) was the evidence presented for a legitimate purpose under Evid.R. 404(B)(2), and (3) was the probative value of the evidence substantially outweighed by the danger of unfair prejudice. *Id.* at ¶ 19-20.

{¶ 63} But in *Hartman*, the Supreme Court explained that

in Evid.R. 404(B) cases, the inquiry is not whether the other-acts evidence is relevant to the ultimate determination of guilt. Rather, the court must evaluate whether the evidence is relevant to the particular purpose for which it is offered. *See Curry*, 43 Ohio St.2d at 73, 330 N.E.2d 720. That is to say, the other-acts evidence must be probative of a "purpose other than the person's character or propensity to behave in a certain way." [*United States v. Gomez*, 763 F.3d 845, 860 (7th Cir.2014)].

*Hartman* at ¶ 26.

{¶ 64} The *Hartman* Court further cautioned courts to "keep in mind that it is not enough to say that the evidence is relevant to a nonpropensity purpose." *Id.* at ¶ 27. Rather, "[t]he nonpropensity purpose for which the evidence is offered must go to a 'material' issue that is actually in dispute between the parties." *Id.*, citing *Huddleston v. United States*, 485 U.S. 681, 686, 108 S.Ct. 1496, 99 L.Ed.2d 771 (1988).

{¶ 65} Therefore, according to *Hartman*, whether the other-acts evidence is relevant under the first step of *Williams* is dependent upon whether the evidence is offered for a nonpropensity purpose as set forth in the second step of *Williams*, i.e., a legitimate purpose for which the evidence is offered, and whether the nonpropensity purpose goes to a material issue in the case. Thus, we will discuss

the first two steps together (as the Supreme Court did in *Hartman*). *See Hartman,* 161 Ohio St.3d 214, 2020-Ohio-4440, 161 N.E.3d 651, at ¶ 24-28.

### a. Relevance to Nonpropensity Purpose

{¶ 66} Hale challenges the July 2022 evidence as being irrelevant and unfairly prejudicial. He argues that the "unconvicted conduct allegedly occurred many months before" the murder, and that "[t]he events on November 8, 2022, involving Mr. Fincher had nothing to do with the Sandusky incident involving J.W."

{¶ 67} The state counters that Hale's "assertions fail to consider the fundamental interrelationship between the parties in this case" and that the other-acts evidence provided background information. In support of this position, the state relied on *State v. Bone,* 10th Dist. Franklin No. 05AP565, 2006-Ohio-3809, which held that "[o]ther acts evidence may generally be introduced when the evidence forms 'part of the immediate background of the alleged act which forms the foundation of the crime charged in the indictment.'" *Id.* at ¶ 30. According to the state:

> The evidence at trial established that J.W. had a relationship with Hale, which ended, and that despite this, Hale continued to pursue and stalk J.W. J.W. also began a relationship with Fincher. Hale's historical and current obsession with J.W. provided the backdrop and impetus for the crimes committed against Fincher on November [8], 2022. The evidence at trial, taken as a whole, established that Fincher would not have been killed on November [8], 2022 if he not been involved with J.W. [and] if Hale heeded J.W.'s pleas to leave her alone.

{¶ 68} We agree with the state. In *State v. Thompson,* 66 Ohio St.2d 496, 498, 422 N.E.2d 855 (1981), the Ohio Supreme Court stated such background

evidence was admissible if the "other acts" were "inextricably related" to the crime charged and where the "challenged evidence plays an integral part of explaining the sequence of events and is necessary to give a complete picture of the alleged crime." In *State v. Wilkinson*, 64 Ohio St.2d 308, 318, 415 N.E.2d 261 (1980), the court stated other-acts evidence may be admissible when proof of the charged crime incidentally involves the other-acts evidence.

{¶ 69} Hale argued at trial that it was unlikely that he threatened Fincher because there was no evidence that Hale even knew Fincher. He claimed that it was coincidental that he was following J.W. on the morning of November 8, 2022, because he lived one street away from Fincher. Hale tried to paint a picture to the jury that he and J.W. had a normal breakup with some hard feelings, but nothing out of the ordinary and nothing that would make a person respond violently.

{¶ 70} The other-acts evidence of the July 2022 events provided background evidence that was relevant to proving the nonpropensity purpose of motive, which was a material issue that was directly in dispute between the parties.[2] *See Hartman*, 161 Ohio St.3d 214, 2020-Ohio-4440, 161 N.E.3d 651, at ¶ 26-27. "Motive evidence establishes that the accused had a specific reason to commit a crime." *Id.* at ¶ 48, citing Weissenberger, *Federal Evidence*, Section 404.16 (7th Ed.2019). When motive is at issue, "[t]here need be no similarity between the other-acts evidence and

---

[2] "Absence of mistake or lack of accident" were not relevant material issues in this case because Hale did not argue that he accidentally or mistakenly hit Fincher with his truck.

the crime charged under a motive theory; 'a dissimilar prior act is just as feasible in supplying a motive for committing a crime as is a similar prior act.'" *Id.*, quoting Weissenberger at Section 404.16.

{¶ 71} The other-acts evidence in this case — the July 2022 events — was relevant to establishing that Hale did not react in an ordinary way when he and J.W. broke up. Regarding the text messages, Hale tried to argue that his text messages to J.W. were typical breakup messages. Hale even tried to suggest that his text messages to J.W. established that he and J.W. were still trying to maintain a relationship at that point. However, the 378 text messages that Hale sent to J.W. in an 11-day period in July 2022 did not indicate that he and J.W. were attempting to reconcile or maintain a relationship.

{¶ 72} Further, J.W. testified that Hale would show up at her work unannounced at very early hours, and that she and her coworkers were afraid of Hale. Hale texted J.W. photos of her car when she was parked somewhere and made comments about her nails after she had gone to the nail salon. J.W. said that Hale was letting her know that he was watching her. In late July 2022, Hale waited outside of J.W.'s home until she arrived at midnight, pushing his way inside her house as she was telling him to leave, and then getting into a physical fight with her and destroying things in her home. He began calling her again in late September and texting her in October. And three days before Hale ran his truck into Fincher, J.W. testified that Hale threatened her, her daughter, and Fincher.

{¶ 73} Therefore, evidence of what occurred from July 2022 through the day of the murder was relevant to provide background for the crimes that took place on November 8, 2022. It was further relevant to establish the nonpropensity purpose of motive, which was a material issue in dispute at trial. *See Spaulding*, 151 Ohio St.3d 378, 2016-Ohio-8126, 89 N.E.3d 554, at ¶ 113 (other-acts evidence may be admitted to provide context and potential motive for crimes the defendant was charged with committing).

### b. Probative Value Versus Unfair Prejudice

{¶ 74} Hale conceded during closing arguments that 80 percent of the facts in this case were not in dispute. Hale acknowledged to the jury, however, that what was in dispute was what was going through Hale's mind as he sat in his truck — moments before deciding to rev up his engine, put his car into drive, push down on his gas pedal, turn his wheels towards Fincher, and accelerate at a very high speed towards Fincher. Hale's motive was highly in dispute and important to the resolution of the case. The other-acts evidence negated Hale's assertion that he did not plan to kill Fincher. Therefore, the probative value of the evidence was high, which decreased the risk of unfair prejudice. *Hartman,* 161 Ohio St.3d 214, 2020-Ohio-4440, 161 N.E.3d 651, at ¶ 34.

{¶ 75} Accordingly, we find as a matter of law that the state's evidence relating to what occurred in July 2022 was relevant to providing background and motive for the crimes that occurred on November 8, 2022. That is, the state did not present it to establish that Hale was a "bad guy" who was prone to violent acts. We

further conclude that the evidence was not unfairly prejudicial, and therefore, the trial court did not abuse its discretion in allowing the state to present it at trial.

**E. Conclusion**

{¶ 76} After review, we conclude that the trial court did not abuse its discretion when it denied Hale's motion to sever. The state overcame Hale's claim of prejudicial joinder by both methods set forth in *Lott*, 51 Ohio St.3d at 163, 555 N.E.2d 293. It established that the evidence was simple and direct and that it would have been able to present evidence of the other crimes at separate trials if it had tried them separately.

{¶ 77} We therefore overrule Hale's first and second assignments of error.

## IV. Indictment

{¶ 78} In his third assignment of error, Hale argues that the state effectively amended the indictment two weeks before trial when it filed its "Notice of Intent to use 404(B) Evidence of Prior Acts." He claims that he was indicted with one count of menacing by stalking that occurred "on or about November 8, 2022," and that "his Bill of Particulars reflected the same date," but that he was improperly "convicted based upon conduct for which he was not indicted."

{¶ 79} Hale did not raise this issue to the trial court. He has therefore forfeited all but plain error. *State v. Rogers*, 143 Ohio St.3d 385, 2015-Ohio-2459, 38 N.E.3d 860, ¶ 3. Under Crim.R. 52(B), "plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." To establish plain error, appellant must show that, but for the error, the

outcome of the trial would have been different. *State v Barnes*, 94 Ohio St.3d 21, 27, 759 N.E.2d 1240 (2002). Even if an offender demonstrates plain error, however, "an appellate court is not required to correct it." *Rogers* at ¶ 23. Plain error is to be invoked "with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *Id.*, citing *Barnes* at 27.

{¶ 80} Section 10, Article I of the Ohio Constitution states: "No person shall be held to answer for a capital, or otherwise infamous crime, unless on presentment or indictment of a grand jury." This constitutional provision guarantees the accused that the essential facts constituting the offense for which he or she is tried will be found in the indictment of the grand jury. *State v. Thompson*, 8th Dist. Cuyahoga No. 85843, 2006-Ohio-3162, ¶ 14.

{¶ 81} As we previously explained, in its notice of intent to use Evid.R. 404(B) evidence, the state informed the court and Hale that it intended to present evidence that Hale previously threatened J.W., broke into her home, assaulted her, and followed her on previous occasions, namely, the evidence establishing what occurred in July 2022. Hale asserts that the state never moved to amend the indictment to include the July 2022 events, something it would not have been permitted to do because the "other acts and dates" were not included in the indictment or bill of particulars. Hale contends that although the "other acts and dates" were not in the indictment or bill of particulars, the state impermissibly presented witnesses to testify to them.

{¶ 82} The grand jury indicted Hale with menacing by stalking in violation of R.C. 2903.211(A)(1), which allegedly occurred on or about November 8, 2022. R.C. 2903.211(A)(1) provides in relevant part, "No person by engaging in a pattern of conduct shall knowingly cause another person to believe that the offender will cause physical harm to the other person or a family or household member of the other person or cause mental distress to the other person or a family or household member of the other person."

{¶ 83} A pattern of conduct is defined as two or more actions or incidents closely related in time. R.C. 2903.211(D)(1). "The incidents need not occur within any specific temporal period." *Rufener v. Hutson*, 8th Dist. Cuyahoga No. 97635, 2012-Ohio-5061, ¶ 16, citing *Jenkins v. Jenkins*, 10th Dist. Franklin No. 06AP-652, 2007-Ohio-422. Further, two incidents are enough to establish a pattern of conduct for purposes of R.C. 2903.211(A)(1). *State v. O'Reilly*, 8th Dist. Cuyahoga No. 92210, 2009-Ohio-6099, ¶ 34, citing *State v. Rucker*, 12th Dist. Butler No. CA2001-04-076, 2002-Ohio 172. And as we previously explained, "'[o]ther acts evidence can be particularly useful in prosecutions for menacing by stalking because it can assist the jury in understanding that a defendant's otherwise innocent appearing acts, when put into the context of previous contacts he has had with the victim, may be knowing attempts to cause mental distress.'" *Spaulding*, 151 Ohio St.3d 378, 2016-Ohio-8126, 89 N.E.3d 554, at ¶ 114, quoting *Bilder*, 99 Ohio App.3d at 658, 651 N.E.2d 502.

**{¶ 84}** In support of his argument, Hale relies on this court's decision in *State v. Ketchum*, 8th Dist. Cuyahoga No. 109490, 2021-Ohio-1583, which relied on *State v. Vitale*, 96 Ohio App.3d 695, 699, 645 N.E.2d 1277 (8th Dist.1994). Hale now asks that we follow *Ketchum* and *Vitale* and reverse his conviction.

**{¶ 85}** In *Ketchum*, the grand jury indicted the defendant on two counts of menacing by stalking, alleging that the offenses occurred "on or about October 26, 2018." *Id.* at ¶ 4. The state also provided a bill of particulars to the defendant, alleging that the offenses occurred "on or about October 26, 2018." *Id.* at ¶ 5. Prior to trial, the trial court permitted the state to amend the indictment from "on or about October 26, 2018," to a range of "October 26, 2018 to December 24, 2018." *Id.* at ¶ 6. The defendant argued on appeal that the trial court erred when it permitted the state to amend the indictment.

**{¶ 86}** We agreed with the defendant in *Ketchum*. We explained that the grand jury found, and the bill of particulars confirmed, that the date of the offense was on or about October 26, 2018. We noted that "for the jury to find Ketchum guilty of menacing by stalking it would have had to have found that he committed two or more qualifying actions or incidents closely related in time on or about October 26, 2018." However, the victim in the case testified and "was unequivocal: '[h]e did not threaten me on that day.'" *Id.* at ¶ 28. We concluded that it was irrelevant if the state proved the December 24, 2018 incident (or a 2015 incident but the state did not amend the indictment to include the 2015 incident) because the

fact that it was not "presented to the grand jury in the first place was fatal." *Id.* at ¶ 31.

{¶ 87} In *Vitale*, the indictment alleged that a theft had occurred on June 14, 1991. The bill of particulars further specified that the offense occurred "on or about June 14, 1991 at approximately 12:00 p.m., at the location of 1869 East 79th Street, in the City of Cleveland, Ohio." The evidence at trial, however, indicated that the theft occurred on a different date, June 21, 1991, at a different location (the alleged victim's house, not the victim's place of business). At the conclusion of the state's case, the trial court permitted the state to amend the indictment to show the theft offense was committed from "June 14, 1991 through June 21, 1991 inclusive." This court reversed, explaining

> Under Crim.R. 7(D), the trial court had discretion to amend the indictment "provided no change is made in the name or identity of the crime charged." Obviously, if the identity of the crime moves from events on June 14 to different events on June 21, at a different time and place, the identity of the crime has been improperly changed.

*Id.* at 700-701.

{¶ 88} We concluded in *Vitale* that the issue was not whether the defendant was prejudiced. *Id.* at 701. Rather, "the issue [was] whether [the defendant] was convicted on the same evidence on which he was indicted." *Id.* We explained, "If no evidence is presented that the alleged offenses occurred within the bracketed time frames specified in the indictment, the counts in the indictment relating to those offenses should be dismissed. Any variance of proof outside the parameters of time established by the indictment may constitute a separate offense." *Id.*

{¶ 89} *Vitale,* 96 Ohio App.3d 695, 699, 645 N.E.2d 1277, and *Ketchum,* 8th Dist. Cuyahoga No. 109490, 2021-Ohio-1583, are easily distinguishable from the facts in the present case. First, in *Vitale*, the state amended the indictment after presenting its case to the jury to include a new theft offense that occurred at a different place and time than what was set forth in the original indictment. That is not the case here. The state indicted Hale on menacing by stalking that occurred on or around November 8, 2022, and proved that Hale committed stalking on or around November 8, 2022.

{¶ 90} Second, in *Ketchum*, the state did not present any evidence that the victim was stalked on or around the original date that it had alleged in the indictment. That is not the case here. The victim testified that Hale was following her on the morning of November 8, 2022. He tried to run her off the road while she was driving. He dented her vehicle while trying to do so. And after she stopped her vehicle, he physically assaulted her and threatened her, "I told you if I caught you up here I'm going to [f*ck] you up," and "I told you if I find you up here again, I was either going to kill you or him [Fincher]." The victim further testified that just days before the events of November 8, Hale called J.W. while she was driving and threatened her, her daughter, and Fincher. Thus, *Ketchum* is not applicable here.

{¶ 91} To the extent that Hale argues that the state used the other-acts evidence — evidence of Hale's conduct in July and October 2022 — in its closing arguments "as though those dates were a continuing course of conduct" and "proof of the essential elements" of menacing by stalking, we disagree with Hale's

characterization. As we previously explained, the state was permitted to present evidence of past events to establish pattern of conduct and mental distress, which are essential elements of menacing by stalking.

{¶ 92} Accordingly, we find no error, plain or otherwise. Hale's third assignment of error is overruled.

## V. Inferior Offenses

{¶ 93} In his fourth assignment of error, Hale argues that his due process rights were violated when the trial court denied his request to instruct the jury on the inferior offense of voluntary manslaughter for the murder counts and the inferior offense of aggravated assault for the felonious assault counts.[3] He maintains that "there was sufficient evidence that he acted under a strong provocation" because minutes before "Mr. Fincher's death, Mr. Fincher severely beat Mr. Hale, causing him to fall to the ground."

{¶ 94} "When the indictment or information charges an offense, including different degrees, or if other offenses are included within the offense charged, the jury may find the defendant not guilty of the degree charged but guilty of an inferior degree thereof or lesser included offense." R.C. 2945.74; *see also* Crim.R. 31(C). The Ohio Supreme Court has explained that under Crim.R. 31(C) and R.C. 2945.74, a

---

[3] Hale also argued that the trial court erred when it did not give jury instructions on the inferior offense of attempted felonious assault. The facts supporting attempted felonious assault involved J.W. (when Hale pushed J.W.'s car door into her, as evidenced by the state's first video footage played at trial). Throughout this assignment of error, however, Hale argues only the facts related to Fincher.

jury may consider lesser unindicted offenses only if the evidence supports the lesser charge and the lesser charge falls into one of three groups: (1) a lesser-included offense of the crime charged, (2) an inferior degree of the crime charged, or (3) an attempt to commit the crime charged, if such an attempt is an offense at law. *State v. Deem*, 40 Ohio St.3d 205, 533 N.E.2d 294 (1988), paragraph one of the syllabus. At issue in this case are inferior offenses. "An offense is an 'inferior degree' of the indicted offense where its elements are identical to or contained within the indicted offense, except for one or more additional mitigating elements." *Id.* at paragraph two of the syllabus.

{¶ 95} A defendant bears the burden of proving the mitigating factor by a preponderance of the evidence. *See State v. Rhodes*, 63 Ohio St.3d 613, 590 N.E.2d 261 (1992), syllabus; *State v. Williams*, 8th Dist. Cuyahoga No. 98210, 2013-Ohio-573, ¶ 21. An "instruction is not warranted every time 'some evidence' is presented [on] a lesser-included offense." *State v. Trimble*, 122 Ohio St.3d 297, 2009-Ohio-2961, 911 N.E.2d 242, ¶ 192, quoting *State v. Shane*, 63 Ohio St.3d 630, 632, 590 N.E.2d 272 (1992). Rather, there must be "'sufficient evidence' to 'allow a jury to *reasonably* reject the greater offense and find the defendant guilty on a lesser included (or inferior-degree) offense.'" (Emphasis sic.) *Trimble* at ¶ 192, quoting *Shane* at 632-633. Thus, a defendant is entitled to an instruction on an inferior-degree offense "when the evidence presented at trial would reasonably support both an acquittal" on the charged crime and a conviction for the inferior offense. *Deem* at 211.

{¶ 96} An aggravated assault occurs when a defendant knowingly causes serious physical harm in response to a serious provocation by the victim. R.C. 2903.12(A)(1). Aggravated assault is an inferior offense of felonious assault. *Deem* at 210-211.

{¶ 97} Voluntary manslaughter is defined in R.C. 2903.03(A) and provides that "[n]o person, while under the influence of sudden passion or in a sudden fit of rage, either of which is brought on by serious provocation occasioned by the victim that is reasonably sufficient to incite the person into using deadly force, shall knowingly cause the death of another * * *." Voluntary manslaughter is an inferior offense of murder and aggravated murder. *Shane* at 632 (murder); *State v. Benge*, 75 Ohio St.3d 136, 140, 661 N.E.2d 1019 (1996) (aggravated murder).

{¶ 98} To determine whether sufficient evidence of serious provocation exists, a trial court must engage in a two-part inquiry. *State v. Balis*, 8th Dist. Cuyahoga No. 101520, 2015-Ohio-1296, ¶ 9-10. First, the court must objectively determine whether the alleged provocation is reasonably sufficient to bring on a sudden passion or fit of rage. *State v. Mack*, 82 Ohio St.3d 198, 201, 694 N.E.2d 1328 (1998). To be reasonably sufficient, the provocation "must be *serious.*" (Emphasis sic.) *Shane*, 63 Ohio St.3d at 639, 590 N.E.2d 272. If this objective standard is met, the inquiry shifts to a subjective standard, to determine whether the defendant in the particular case "actually was under the influence of sudden passion or in a sudden fit of rage." *Shane* at 634. It is only at that point that the "emotional and mental state of the defendant and the conditions and circumstances

that surrounded him at the time" must be considered. *Deem*, 40 Ohio St.3d 205, 533 N.E.2d 294, at paragraph five of the syllabus.

{¶ 99} We review a trial court's refusal to instruct the jury on an inferior offense for an abuse of discretion. *State v. Thompson*, 141 Ohio St.3d 254, 2014-Ohio-4751, 23 N.E.3d 1096, ¶ 152.

{¶ 100} In this case, the trial court analyzed both elements, serious provocation and sudden passion or fit of rage, objectively and subjectively. With respect to serious provocation invoked by the victim, the trial court found that the fight between Hale and Fincher amounted to "mutual combat." The court further found that the fight was objectively insufficient to provoke the use of deadly force because the fight had ended, and the participants had gone in opposite directions. The trial court also found that Hale was not subjectively provoked by the victim because the evidence established that Hale was already angry "well before" the victim appeared.

{¶ 101} With respect to whether the provocation caused Hale to act with a sudden passion or fit of rage, the trial court found that objectively, "a reasonable man so provoked would not have cooled off in the interval of time between the provocation and the delivery of the fatal blow." But subjectively, the trial court found that the evidence established that Hale cooled off by the time he decided to run his truck into Fincher.

{¶ 102} We note that the trial court only had to analyze "serious provocation" objectively and "sudden passion or fit of rage" subjectively; it did not have to analyze

both factors objectively and subjectively. But considering the trial court's proper analysis with respect to each factor, we find no abuse of discretion.

{¶ 103} Hale argues that the video in this case provided proof that he was "viciously beaten" by the victim, which he claims was objectively and subjectively sufficient to establish that the victim seriously provoked him. We disagree. Although it appears from the video that Fincher overpowered Hale during the physical altercation, J.W. testified that Hale threw the first punch. Therefore, any provocation was not brought on by the victim. But even if we assume for the sake of argument that Hale is correct about there being serious provocation, he failed to establish that he subjectively acted under a sudden passion or rage.

{¶ 104} Courts have held that any passion or rage felt by an offender who has time to cool off does not qualify for "sudden passion" or "fit of rage." These cases indicate that the "cooling off period" can be a very short time. *See*, *e.g.*, *State v. Snyder*, 5th Dist. Tuscarawas No. 10AP060021, 2011-Ohio-3334 (voluntary manslaughter instruction not warranted where defendant retrieved a second weapon in the midst of an altercation, with which the victim was then killed); *State v. Stanley*, 7th Dist. Mahoning No. 14 MA 0106, 2016-Ohio-7284, ¶ 24 (the time it took for defendant to leave in his car, apparently obtain his gun, and then return to the business three to five minutes later was a sufficient cooling-off period); *State v. Caulton*, 7th Dist. Mahoning No. 09 MA 140, 2011-Ohio-6636, ¶ 72 (shooting the victim several times, walking away, and then returning to "finish him off" by shooting him several more times shows cool deliberation rather than sudden

passion); *State v. Shakoor*, 7th Dist. Mahoning No. 01CA121, 2003-Ohio-5140, ¶ 105, citing *State v. Crago*, 93 Ohio App.3d 621, 644, 639 N.E.2d 801 (10th Dist.1994) (shooting victim in the head, then standing over him and shooting him multiple additional times, tends to show cool deliberation and not sudden passion).

{¶ 105} After reviewing the video footage from the gas station and the testimony presented at trial, we agree with the trial court. While Hale is correct that not much time elapsed between the end of the fight and when he accelerated toward the victim, that is not the sole factor courts look at when determining if a defendant acted with a sudden passion or rage. In this case, Hale walked back to his truck, put it into reverse, backed up a few feet, revved up his engine, turned his wheel towards Fincher, put his foot on the gas pedal, and accelerated very fast toward Fincher, who was walking to his car. Hale hit Fincher with the grill of his truck, pushing him down the street until Fincher fell from the front of Hale's truck, and Hale ran over Fincher. These facts do not indicate that Hale acted under the influence of sudden passion or in a fit of rage. Rather, they indicate that Hale thought about what he was going to do and then executed it.

{¶ 106} On the record before us, the trial court did not abuse its discretion when it denied Hale's request for jury instructions on the inferior offenses of aggravated murder, murder, and felonious assault. We simply cannot say that the jury would have reasonably found Hale not guilty of the greater offenses and guilty on the inferior offenses.

{¶ 107} Accordingly, we overrule Hale's fourth assignment of error.

## VI. Sufficiency of the Evidence

{¶ 108} In his fifth assignment of error, Hale contends that the state failed to present sufficient evidence of aggravated murder and attempted felonious assault. As we previously stated, the attempted felonious assault charge arose from Hale pushing J.W.'s car door against her before they went to the gas station.

{¶ 109} When considering a challenge to the sufficiency of the evidence, we review the evidence admitted at trial and determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus. "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id.* A reviewing court is not to assess "whether the state's evidence is to be believed, but whether, if believed, the evidence against a defendant would support a conviction." *State v. Thompkins*, 78 Ohio St.3d 380, 390, 678 N.E.2d 541 (1997).

### A. Aggravated Murder

{¶ 110} Hale was convicted of aggravated murder under R.C. 2903.01(A). Under this statute, the state was required to prove beyond a reasonable doubt that Hale "purposely, and with prior calculation and design, cause[d] the death" of Fincher. Hale challenges only the element of "prior calculation and design."

{¶ 111} The phrase "prior calculation and design" is not defined in the Ohio Revised Code, but the Ohio Supreme Court has interpreted it "to require evidence of

'more than [a] few moments of deliberation'" and "'a scheme designed to implement the calculated decision to kill.'" *State v. Conway*, 108 Ohio St.3d 214, 2006-Ohio-791, 842 N.E.2d 996, ¶ 38, quoting *State v. Cotton*, 56 Ohio St.2d 8, 381 N.E.2d 190 (1978), paragraph one of the syllabus. In other words, "[i]nstantaneous deliberation is not sufficient to constitute 'prior calculation and design.'" *Cotton* at paragraph two of the syllabus. "'[N]either the degree of care nor the length of time the offender takes to ponder the crime beforehand'" is a "'critical factor'" in and of itself so long as it amounts to more than "'momentary deliberation.'" *State v. D'Ambrosio*, 67 Ohio St.3d 185, 196, 616 N.E.2d 909 (1993), quoting the 1973 Legislative Service Commission Comment to R.C. 2903.01.

{¶ 112} The state can prove "prior calculation and design" from the circumstances surrounding a murder in several ways, including: (1) "evidence of a preconceived plan leading up to the murder"; (2) "evidence of the [defendant's] encounter with the victim, including evidence necessary to infer that the defendant had a preconceived notion to kill regardless of how the [events] unfolded"; or (3) "evidence that the murder was executed in such a manner that circumstantially proved the defendant had a preconceived plan to kill," such as where the victim is killed in a cold-blooded, execution-style manner. *State v. Orr*, 8th Dist. Cuyahoga No. 100841, 2014-Ohio-4680, ¶ 75, citing *State v. Dunford*, 11th Dist. Ashtabula No. 2009-A-0027, 2010-Ohio-1272, ¶ 53; *State v. Trewartha*, 165 Ohio App.3d 91, 2005-Ohio-5697, 844 N.E.2d 1218 (10th Dist.); *State v. Hough*, 8th Dist. Cuyahoga No. 91691, 2010-Ohio-2770, ¶ 19 ("[I]f the victim is killed in a cold-blooded,

execution-style manner, the killing bespeaks aforethought, and a jury may infer prior calculation and design.").

{¶ 113} The Ohio Supreme Court has identified several other factors to be weighed along with the totality of the circumstances surrounding the murder when determining whether the defendant acted with prior calculation and design, including (1) whether the defendant and the victim knew each other and, if so, whether the relationship was strained, (2) whether there was thought or preparation in choosing the murder weapon or murder site, and (3) whether the act was "drawn out" or "an almost instantaneous eruption of events." *State v. Taylor*, 78 Ohio St.3d 15, 19, 676 N.E.2d 82 (1997), citing *State v. Jenkins*, 48 Ohio App.2d 99, 102, 355 N.E.2d 825 (8th Dist.1976).

{¶ 114} However, the Ohio Supreme Court has made clear that "the *Taylor* factors are not dispositive." *State v. Jones*, 166 Ohio St.3d 85, 2021-Ohio-3311, 182 N.E.3d 1161, ¶ 17. "Rather, a trier of fact's finding of prior calculation and design is warranted when the evidence shows a defendant had the time and opportunity to plan a homicide and the homicide's circumstances" establish "'"a scheme designed to implement the calculated decision to kill."'" *Id.*, quoting *State v. Maxwell*, 139 Ohio St.3d 12, 2014-Ohio-1019, 9 N.E.3d 930, ¶ 148, quoting *Cotton*, 56 Ohio St.2d 8, 381 N.E.2d 190, at paragraph three of the syllabus. Further, a "short period of time in itself does not preclude a finding of prior calculation and design." *State v. Worley*, 8th Dist. Cuyahoga No. 103105, 2016-Ohio-2722, at ¶ 17, citing *Taylor* at 19. Further, there is no "bright-line test" for determining the presence or absence of

prior calculation and design; instead, each case turns on the particular facts and evidence presented at trial. *Maxwell* at ¶ 148, citing *Taylor* at 20.

{¶ 115} Hale argues that the evidence establishes that he was "acting under sudden provocation occasioned by Mr. Fincher" and that he made a "split decision to accelerate his car, hitting Mr. Fincher." Hale states that the evidence shows that he did not know Fincher, nor did he go to the gas station with the intent to harm Fincher. He also asserts that the short timeframe — the period from when he entered his truck after the fight until he accelerated his vehicle toward Fincher — was approximately one minute and establishes nothing more than "a momentary consideration," not prior calculation and design.

{¶ 116} The state argues that the video provides sufficient evidence of prior calculation and design. According to the state:

> The video demonstrates that after the fight, Hale proceeded back to his truck and got into it, at approximately 7:32:46; he turned his wheels and revered, repositioning himself, at approximately 7:32:53; and he allowed Fincher to get the maximum distance away from him before reaching the relative safety of his own car, before Hale closed the distance and accelerated into Fincher, at approximately 7:33:04. Moreover, once Hale struck Fincher, he did not stop or otherwise attempt to limit the injury caused to Fincher. In fact, to the contrary, the video demonstrates that Hale continued to accelerate and drug Fincher out into the traffic-filled street. Each of these decisions depicted on video, when viewed in a light most favorable to the state, demonstrate that Hale made the clear decision to kill Fincher then and there, and further, that he carried that plan out.

{¶ 117} We agree with the state. We have independently reviewed the video. When J.W. pulled into the gas station, Hale parked parallel to J.W.'s vehicle, next to and very close to her driver's side door but in the opposite direction. After the fight

ended, Hale got into his truck and put it in reverse. Hale backed his truck up several feet, enough so that the front of J.W.'s car could then be seen in the video. As Hale was backing up, he turned his wheels in the direction of Fincher, who was walking back to his car. As J.W. began to pull away, Hale accelerated his vehicle toward Fincher and hit him with his truck. The video depicts Fincher up against the front grill of Hale's truck as Hale exited the gas station at a high rate of speed. And just before Hale reached the street, Fincher fell to the ground and Hale ran over him and dragged him up the street for quite a distance.

{¶ 118} When conducting a sufficiency review, the Ohio Supreme Court reminded reviewing courts,

> it is worth remembering what is not part of the court's role when conducting a sufficiency review. It falls to the trier of fact to "'resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.'" [*State v. McFarland*, 162 Ohio St.3d 36, 2020-Ohio-3343, 164 N.E.3d 316,] ¶ 24, quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Thus, an appellate court's role is limited. It does not ask whether the evidence should be believed or assess the evidence's "credibility or effect in inducing belief." *State v. Richardson*, 150 Ohio St.3d 554, 2016-Ohio-8448, 84 N.E.3d 993, ¶ 13, citing *Thompkins*, 78 Ohio St.3d at 386, 678 N.E.2d 541. Instead, it asks whether the evidence against a defendant, if believed, supports the conviction. *Thompkins* at 390 (Cook, J., concurring).

*Jones*, 166 Ohio St.3d 85, 2021-Ohio-3311, 182 N.E.3d 1161, at ¶ 16.

{¶ 119} With this standard in mind and reviewing the totality of the circumstances surrounding the murder, we conclude that the state's evidence was sufficient for a rational trier of fact to find beyond a reasonable doubt that Hale acted with prior calculation and design.

**B. Attempted Felonious Assault**

{¶ 120} Hale also challenges his conviction for attempted felonious assault in violation of R.C. 2923.02 and 2903.11(A)(1). He argues that the state failed to present sufficient evidence that he attempted to cause J.W. serious physical harm when he "pushed on the open car door" against J.W. He maintains that the evidence merely established that he attempted to cause her physical harm, not serious physical harm.

{¶ 121} R.C. 2903.11(A)(1) provides that "no person shall knowingly cause serious physical harm to another[.]" R.C. 2923.02(A) (the attempt statute) provides that "[n]o person, purposely or knowingly, * * * shall engage in conduct that, if successful, would constitute or result in the offense."

{¶ 122} "Serious physical harm to persons" means any of the following:

(a) Any mental illness or condition of such gravity as would normally require hospitalization or prolonged psychiatric treatment;

(b) Any physical harm that carries a substantial risk of death;

(c) Any physical harm that involves some permanent incapacity, whether partial or total, or that involves some temporary, substantial incapacity;

(d) Any physical harm that involves some permanent disfigurement or that involves some temporary, serious disfigurement;

(e) Any physical harm that involves acute pain of such duration as to result in substantial suffering or that involves any degree of prolonged or intractable pain.

R.C. 2901.01(A)(5).

{¶ 123} We have reviewed the 14-second video taken by someone who was in a car directly behind Hale's truck. When the video starts, J.W. is outside of her car with her driver's side door open. She is standing inside the open door, close to her car. When the video starts, it appears as if the physical altercation between Hale and J.W. had already begun. The video shows J.W. trying to hit Hale, and then Hale pushed J.W.'s driver's side door into her, hard enough to cause J.W.'s body and head to hit the frame of her vehicle. Further, J.W. stated that Hale "slammed [her] into the door" of her car. She said her entire left side of her body hurt.

{¶ 124} After review, we conclude that the state presented sufficient evidence that Hale knowingly engaged in conduct that, if successful, would have caused serious physical harm to J.W.

{¶ 125} Hale's fifth assignment of error is overruled.

## VII. Autopsy Photos

{¶ 126} In his sixth assignment of error, Hale argues that the trial court erred and violated his right to a fair trial when it permitted the state to admit "gruesome, repetitive[,] and cumulative autopsy photos[,]" which unduly influenced the jury. Hale maintains that "[t]he photos were not necessary as the death was entirely captured on video and there was no question of manner or circumstance[s] of the death." He therefore contends that there was no probative value to the autopsy photos other than to inflame the jury.

{¶ 127} The prosecution is entitled to present evidence showing the cause of death, even if the cause is uncontested, to give the jury an "'appreciation of the

nature and circumstances of the crimes.'" *State v. Chatmon*, 8th Dist. Cuyahoga No. 99508, 2013-Ohio-5245, ¶ 41, citing *State v. Evans*, 63 Ohio St.3d 231, 251, 586 N.E.2d 1042 (1992). Nevertheless, the admission of autopsy photographs cannot contravene the rules of evidence. *See id.* Evid.R. 403(A) dictates when a trial court must exclude evidence. It states, "Although relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." Under Evid.R. 403(B), relevant evidence "may be excluded if its probative value is substantially outweighed by considerations of undue delay, or needless presentation of cumulative evidence." The admission or exclusion of such photographic evidence is left to the discretion of the trial court. *State v. Frazier*, 61 Ohio St.3d 247, 252, 574 N.E.2d 483 (1991), citing *State v. Hill*, 12 Ohio St.2d 88, 90, 232 N.E.2d 394 (1967), paragraph two of the syllabus.

{¶ 128} The forensic pathologist in this case, Elizabeth Mooney, testified that the cause of Fincher's death was internal and external injuries caused by blunt force, including multiple injuries to Fincher's head, neck, torso, and extremities. She reported that Fincher had "crush injuries and multiple fractures." During her testimony, the state showed the jury 19 autopsy photos over Hale's objection. The trial court deferred its ruling on Hale's objection until the close of the state's case.

{¶ 129} After the state had presented its case, the trial court sustained Hale's objection with respect to nine of the autopsy photos. The trial court found that the remaining ten photos had significant probative value toward proving beyond a

reasonable doubt that Hale intended to cause Fincher's death. The trial court further reasoned that the remaining photos "buttress[ed] the pathologist's testimony about the cause and manner of death."

{¶ 130} After review, we find no abuse of discretion on the part of the trial court. The first photo shows injuries to Fincher's head and upper chest. The second photo shows injuries to Fincher's shoulder. The third photo shows injuries to the right side of Fincher's body from his shoulder to mid-thigh, exhibiting injuries to his elbow, torso, back, side, and hip. The fourth photo shows injuries to the top side of Fincher's right arm. The fifth photo shows injuries to Fincher's left shoulder and left torso. The sixth photo shows injuries to Fincher's left hand. The seventh and eighth photos show injuries to Fincher's left torso, with one view from the left side of Fincher's body and one from above Fincher's body. The ninth photo shows injuries to Fincher's back side. And the tenth photo shows injuries to the back of Fincher's head.

{¶ 131} As we have previously noted, "[t]he gruesomeness of photographs from a violent crime can be subjectively debated." *State v. Catron*, 8th Dist. Cuyahoga No. 101789, 2015-Ohio-2697, ¶ 27. Moreover, "'the mere fact that [a photograph] is gruesome or horrendous is not sufficient to render it inadmissible if the trial court, in the exercise of its discretion, feels that it would prove useful to the jury.'" *Frazier*, 61 Ohio St.3d at 252, 574 N.E.2d 483, quoting *State v. Woodards*, 6 Ohio St.2d 14, 25, 215 N.E.2d 568 (1966). *See also State v. Biros*, 78 Ohio St.3d 426, 445, 678 N.E.2d 891 (1997) (although gruesome, photographs of the victim's body

were probative "of contested issues of intent, purpose, motive, and the cause, manner and circumstances of the victim's death").

{¶ 132} But even assuming the photos are gruesome, the probative value of the autopsy photos in this case does not substantially outweigh the danger of unfair prejudice. The photos "illustrate the testimony" of the forensic pathologist, who testified to the nature of Fincher's wounds and cause of death. *State v. Garcia-Toro*, 8th Dist. Cuyahoga No. 107940, 2019-Ohio-5336, ¶ 38.

{¶ 133} We further find that except for the two photos of Fincher's left torso, which essentially showed the same injury from a different angle, all the other photos showed injuries to different parts of Hale's body. Even assuming that one of the photos of Fincher's left torso was admitted in error, we cannot say that the outcome of trial would have been different but for the admission of that one photo. Accordingly, Hale was not prejudiced by its admission.

{¶ 134} Hale's sixth assignment of error is overruled.

## VIII. Manifest Weight of the Evidence

{¶ 135} In his seventh assignment of error, Hale argues that "there was not competent credible evidence to sustain any of his convictions." He asks this court to "sit as the thirteenth juror," evaluate the evidence, and find that his convictions were against the manifest weight of the evidence.

{¶ 136} While the test for sufficiency requires a determination of whether the state has met its burden of production at trial, a manifest weight challenge questions whether the state has met its burden of persuasion. *Thompkins*, 78 Ohio

St.3d at 390, 678 N.E.2d 541. While "sufficiency of the evidence is a test of adequacy as to whether the evidence is legally sufficient to support a verdict as a matter of law, * * * weight of the evidence addresses the evidence's effect of inducing belief." *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 25, citing *Thompkins* at 386-387. When a defendant argues his or her conviction is against the manifest weight of the evidence, the court,

> "reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction."

*Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶ 137} Hale argues that there was no evidence of prior calculation and design. He asks this court to weigh the evidence rather than view it for sufficiency purposes. He maintains that the lack of a prior relationship between him and Fincher, the lack of preplanning, and the fact that "it was less than two minutes from the time he was beaten to when he accelerates" his truck into Fincher, all weigh "in favor of no premeditation."

{¶ 138} After independently considering the evidence of prior calculation and design that we previously set forth in the sufficiency analysis, we conclude that the state met its burden of persuasion. Based upon the video of Hale getting into his

truck, backing up, and turning his front wheels toward Fincher, we conclude that Hale "purposely, and with prior calculation and design, cause[d] the death" of Fincher.

{¶ 139} Hale further argues that there was no competent evidence that he purposely intended to cause Fincher's death in Count 2. He claims that it is just as likely that he intended to cause physical harm to Fincher and was reckless in his actions. Count 2 charged murder under R.C. 2903.02(A), which states, "No person shall purposely cause the death of another[.]" "A person acts purposely when it is the person's specific intention to cause a certain result[.]" R.C. 2901.22(A).

{¶ 140} The state's evidence established that Hale used his truck to run it into Fincher, while increasingly accelerating at a high rate of speed, dragging Fincher out of the gas station and down the street, and ultimately running over him. We disagree with Hale that this evidence "just as likely" establishes that he intended to cause Fincher physical harm rather than death. Any vehicle can be a deadly weapon, let alone a large truck. Further, reasonable people should know that if they drive a large truck into a person while accelerating at a high speed, that death is likely to result. Therefore, sitting as the thirteenth juror, we conclude that the state's evidence established that Hale purposely intended to cause Fincher's death.

{¶ 141} Hale also claims that his attempted felonious assault conviction was against the manifest weight of the evidence. He asserts that "the jury lost it[s] way finding that a simple shove of a car door into J.W. was his attempt at causing her serious physical harm." He maintains that it was solely an attempt to cause J.W.

physical harm.  Again, we have independently reviewed the video footage that the state presented at trial regarding this count, and as we previously found, we disagree with Hale that it was a "simple shove."

{¶ 142} Finally, Hale contends that his menacing by stalking conviction was against the manifest weight of the evidence.  His argument with respect to this count is one sentence, namely, that the jury lost its way in finding that he engaged in a pattern of conduct necessary to commit menacing by stalking.  After independently viewing the state's evidence regarding "pattern of conduct," we conclude that the jury did not lose its way in finding that Hale committed menacing by stalking.

{¶ 143} After reviewing the trial transcript, weighing all the evidence and reasonable inferences, and considering the credibility of witnesses, we are unable to conclude that a manifest miscarriage of justice occurred such that Hale's convictions must be reversed.  Hale's seventh assignment of error is overruled.

{¶ 144} Judgment affirmed.

It is ordered that appellee recover from appellant the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.  Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
MICHELLE J. SHEEHAN, JUDGE

KATHLEEN ANN KEOUGH, A.J., and
ANITA LASTER MAYS, J., CONCUR